955 F.2d 1143
 60 USLW 2560, 21 U.S.P.Q.2d 1764
 HARD ROCK CAFE LICENSING CORPORATION, a New York
corporation, Plaintiff-Appellee, Cross-Appellant,
v.
CONCESSION SERVICES, INCORPORATED, a Delaware corporation,
Defendant-Appellant, Cross-Appellee.
HARD ROCK CAFE LICENSING CORPORATION, a New York
corporation, Plaintiff-Appellant,
v.
HARRY'S SWEAT SHOP, a retail establishment, Defendant-Appellee.
 Nos. 90-3427, 90-3467, 90-3458.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 17, 1991.
Decided Feb. 4, 1992.
 
 Eric C. Cohen (argued), Robert B. Breisblatt, Gerald T. Shekleton, Kara F. Cenar, Welsh & Katz, Chicago, Ill., for plaintiff-appellee, cross-appellant.
 L. Andrew Brehm (argued), Michael B. Roche, Daniel M. Blouin, Schuyler, Roche & Zwirner, Chicago, Ill., for defendant-appellant, cross-appellee.
 Gregory B. Beggs (argued), Hugh A. Abrams, Neuman, Williams, Anderson & Olson, Chicago, Ill., for defendant-appellee in No. 90-3458.
 Cyriac D. Kappil, Royal B. Martin, Jr., William G. Sullivan, Asst. Atty. Gen., Silets & Martin, Gregory B. Beggs (argued), Hugh A. Abrams, Neuman, Williams, Anderson & Olson, Chicago, Ill., for defendant-appellee in No. 90-3458.
 Before CUDAHY and MANION, Circuit Judges, and REYNOLDS, Senior District Judge.*
 CUDAHY, Circuit Judge.
 
 
 1
 The Hard Rock Cafe Licensing Corporation (Hard Rock) owns trademarks on several clothing items, including t-shirts and sweatshirts and apparently attempts to exploit its trademark monopoly to the full. In the summer of 1989, Hard Rock sent out specially trained private investigators to look for counterfeit Hard Rock Cafe merchandise. The investigators found Iqbal Parvez selling counterfeit Hard Rock t-shirts from stands in the Tri-State Swap-O-Rama and the Melrose Park Swap-O-Rama, flea markets owned and operated by Concession Services Incorporated (CSI). The investigators also discovered that Harry's Sweat Shop (Harry's) was selling similar items. Hard Rock brought suit against Parvez, CSI, Harry's and others not relevant to this appeal under the Lanham Trademark Act, 15 U.S.C. § 1051 et seq. (1988). Most of the defendants settled, including Parvez, who paid Hard Rock some $30,000. CSI and Harry's went to trial.
 
 
 2
 After a bench trial, the district court found that both remaining defendants violated the Act and entered permanent injunctions forbidding Harry's to sell merchandise bearing Hard Rock's trademarks (whether counterfeit or genuine) and forbidding CSI to permit the sale of such merchandise at its flea markets. The court also awarded treble damages against Harry's. The court did not, however, award attorney's fees against either defendant.
 
 
 3
 All of the parties who participated in the trial appealed. CSI believes that it is not liable and that, in any event, entry of the injunction was inappropriate. Hard Rock wants attorney's fees from both defendants. Harry's appealed from the finding of liability and the entry of the injunction as well, but filed its appeal one day too late; its appeal has therefore been dismissed. Finding errors of law and a fatal ambiguity in the findings of fact, we vacate the judgment against CSI, vacate the denial of attorney's fees and remand for further proceedings.
 
 I.
 
 4
 Most of the facts are undisputed. The following account draws from the district court's findings, the record on appeal and the submissions of the parties. Where there are disputes of fact we will note them and defer to the district court's resolution unless clearly erroneous. Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).
 
 A. The Parties and Their Practices
 
 5
 1. Concession Services, Inc.
 
 
 6
 In the summer of 1989, CSI owned and operated three "Swap-O-Rama" flea markets in the Chicago area: the Tri-State, in Alsip, Illinois; the Melrose Park, in Melrose Park, Illinois; and the Brighton Park, in Chicago itself. Although Parvez sold counterfeits at the Tri-State Swap-O-Rama and at Melrose Park, testimony at trial concentrated on the operations at the Tri-State. We too will refer mainly to the Tri-State Swap-O-Rama, although CSI's operations are apparently similar at all three flea markets.
 
 
 7
 CSI generates revenue from a flea market in four ways. First, it rents space to vendors for flat fees that vary by the day of the week and the location of the space. Second, CSI charges a reservation and storage fee to those vendors who want to reserve the same space on a month-to-month basis. Third, CSI charges shoppers a nominal 75cents admission charge. Fourth, CSI runs concession stands inside the market. To promote its business, CSI advertises the markets, announcing "BARGAINS" to be had, but does not advertise the presence of any individual vendors or any particular goods.
 
 
 8
 Supervision of the flea markets is minimal. CSI posts a sign at the Tri-State prohibiting vendors from selling "illegal goods." It also has "Rules For Sellers" which prohibit the sale of food or beverages,[1] alcohol, weapons, fireworks, live animals, drugs and drug paraphernalia and subversive or un-American literature. Other than these limitations, vendors can, and do, sell almost any conceivable item. Two off-duty police officers provide security and crowd control (an arrangement that does not apply to the other markets). These officers also have some duty to ensure that the vendors obey the Sellers' Rules. The manager of the Tri-State, Albert Barelli, walks around the flea market about five times a day, looking for problems and violations of the rules. No one looks over the vendors' wares before they enter the market and set up their stalls, and any examination after that is cursory. Moreover, Barelli does not keep records of the names and addresses of the vendors. The only penalty for violating the Seller's Rules is expulsion from the market.
 
 
 9
 James Pierski, the vice president in charge of CSI's flea markets, testified that CSI has a policy of cooperating with any trademark owner that notifies CSI of possible infringing activity. But there is no evidence that this policy has ever been carried into effect. Before this case, there have been a few seizures of counterfeit goods at Swap-O-Rama flea markets. In no case was CSI informed of a pending seizure, involved in a seizure or notified as to the ultimate disposition of the seized goods. On the other hand, CSI did not investigate any of the seizures, though it knew they had occurred.
 
 2. Harry's Sweat Shop
 
 10
 Harry's is a small store in Darien, Illinois, owned and operated by Harry Spatero. The store sells athletic shoes, t-shirts, jackets with the names of professional sports teams and the like. Spatero testified that the store contains over 20,000 different items. When buying t-shirts, Harry's is somewhat indiscriminate. The store buys seconds, overruns and closeouts from a variety of sources. Harry's buys most of its t-shirts from Supply Brokers of Pennsylvania, a firm which specializes in buying up stocks from stores going out of business. Spatero testified that Supply Brokers sends him largely unidentified boxes of shirts which he may choose to return after looking them over. But Spatero testified that Harry's also bought shirts from people who came around in unmarked vans, offering shirts at a discount. The store kept no records of the sources of its inventory.
 
 
 11
 3. Hard Rock Licensing Corp.
 
 
 12
 Hard Rock owns the rights to a variety of Hard Rock trademarks. The corporation grants licenses to use its trademarks to the limited partnerships that own and operate the various Hard Rock Cafe restaurants. These restaurants are the only authorized distributors of Hard Rock Cafe merchandise, but apparently this practice of exclusivity is neither publicized nor widely known. The shirts themselves are produced by Winterland Productions, which prints logos on blank, first quality t-shirts that it buys from Hanes, Fruit-of-the-Loom and Anvil. According to the manager of the Chicago Hard Rock Cafe, Scott Floersheimer, Winterland has an agreement with Hard Rock to retain all defective Hard Rock shirts.[2] Thus, if Winterland performs as agreed, all legitimate Hard Rock shirts sold to the public are well-made and cleanly printed.
 
 
 13
 The Chicago Hard Rock Cafe has done very well from its business. Since 1986, it has sold over 500,000 t-shirts at an average gross profit of $10.12 per shirt.
 
 B. The Investigation
 
 14
 National Investigative Services Corporation (NISCOR) carried out the search for counterfeit merchandise on Hard Rock's behalf. Another firm, Trademark Facts, Inc., trained NISCOR's investigators to recognize counterfeit merchandise. Recognizing counterfeit Hard Rock goods was apparently easy. Any shirt not sold in a Hard Rock Cafe restaurant was, unless second-hand, counterfeit. Other than this, the investigators were instructed to check for the manufacturer of the t-shirt, a registration or trademark symbol, the quality of the printed design, the color of the design, the quality of the shirt stock and the price. But as to these latter factors (except for the price), Floersheimer testified that even he would have trouble distinguishing a good counterfeit from a legitimate t-shirt.
 
 
 15
 The investigators visited both the Melrose Park and the Tri-State Swap-O-Ramas and observed Iqbal Parvez (or his employees) offering more than a hundred Hard Rock t-shirts for sale. Cynthia Myers, the chief investigator on the project, testified that these shirts were obviously counterfeit. The shirts were poor quality stock, with cut labels and were being sold for $3 apiece (a legitimate Hard Rock shirt, we are told, goes for over $14). Harry's had four Hard Rock shirts for sale, sitting on a discount table for $3.99 each. The district court found that these too were of obviously low quality, with cut labels and cracked and worn designs. Nonetheless, both Parvez and Harry's were selling t-shirts made by approved manufacturers. Parvez was selling Hanes t-shirts, and Harry's was selling Fruit-of-the-Loom.
 
 
 16
 At no point before filing suit did Hard Rock warn Harry's or CSI (or Parvez, whose supplier Hard Rock was trying to track down) that the shirts were counterfeits.
 
 C. The District Court Proceedings
 
 17
 Hard Rock brought suit against the defendants in September 1989, alleging violations of sections 32 and 43 of the Lanham Act. 15 U.S.C. §§ 1114 & 1125 (1988). Pending trial, the court entered temporary restraining orders and then preliminary injunctions against both CSI and Harry's. Harry's got rid of its remaining Hard Rock t-shirts, and CSI told any vendors selling Hard Rock merchandise in its flea markets to get rid of their stock as well. There have been no more violations.
 
 
 18
 After a bench trial, the district court entered permanent injunctions against both defendants and ordered Harry's to pay treble damages based on Hard Rock's lost profits on four t-shirts (in sum, $120). Findings of Fact, Conclusions of Law and Order at 8 (Sept. 12, 1990) (hereinafter Mem.Op.). The court denied Hard Rock's request for attorney's fees. Id.
 
 
 19
 The court's reasoning is crucial to the resolution of this appeal. Accordingly, we think it appropriate to quote from it at some length. The court concluded that both defendants were "guilty of willful blindness that counterfeit goods were being sold on [their] premises." Id. at 7. Another sentence follows, however, which somewhat dilutes the impact of the preceding finding: "Neither defendant took reasonable steps to detect or prevent the sale of Hard Rock Cafe counterfeit T-shirts on its premise [sic]." Id. This suggests mere negligence.
 
 
 20
 Willful blindness, the court said, "is a sufficient basis for a finding of violation of the Lanham Act. Louis Vuitton S.A. v. Lee, 875 F.2d 584, 590 (7th Cir.1989)." Id. As to CSI's argument that it did not actually sell the offending goods, the court observed that CSI is not "merely a landlord; it also advertises and promoted the activity on its premises, sells admission tickets to buyers and supervises the premises. Under these circumstances it must also take reasonable precautions against the sale of counterfeit products." Id.
 
 II.
 
 21
 The Lanham Trademark Act protects consumers from deceptive claims about the nature and origin of products. 15 U.S.C. § 1114(1)(a) & (b) (use of mark violates Act if "likely to cause confusion, or to cause mistake, or to deceive"); 15 U.S.C. § 1125(a)(1) (false designation of origin violates Act if "likely to cause confusion, or to cause mistake, or to deceive"). But the Lanham Act also protects trademarks as a form of intellectual property. In this case, the Act protects Hard Rock's investment in a fashionable image and a reputation for selling high quality goods. See Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 854 n. 14, 102 S.Ct. 2182, 2188 n. 14, 72 L.Ed.2d 606 (1982) (citing S.Rep. No. 1333, 79th Cong., 2d Sess. 3 (1946)).
 
 A. Secondary Liability
 
 22
 The most interesting issue in this case is CSI's liability for Parvez's sales. Hard Rock argues that CSI has incurred both contributory and vicarious liability for the counterfeits, and we take the theories of liability in that order.
 
 
 23
 It is well established that "if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit." Id. at 854, 102 S.Ct. at 2188 (footnote omitted). Despite this apparently definitive statement, it is not clear how the doctrine applies to people who do not actually manufacture or distribute the good that is ultimately palmed off as made by someone else. A temporary help service, for example, might not be liable if it furnished Parvez the workers he employed to erect his stand, even if the help service knew that Parvez would sell counterfeit goods. Thus we must ask whether the operator of a flea market is more like the manufacturer of a mislabeled good or more like a temporary help service supplying the purveyor of goods. To answer questions of this sort, we have treated trademark infringement as a species of tort and have turned to the common law to guide our inquiry into the appropriate boundaries of liability. David Berg & Co. v. Gatto Int'l Trading Co., 884 F.2d 306, 311 (7th Cir.1989).
 
 
 24
 CSI characterizes its relationship with Parvez as that of landlord and tenant. Hard Rock calls CSI a licensor, not a landlord. Either way, the Restatement of Torts tells us that CSI is responsible for the torts of those it permits on its premises "knowing or having reason to know that the other is acting or will act tortiously...." Restatement (Second) of Torts § 877(c) & cmt. d (1979). The common law, then, imposes the same duty on landlords and licensors that the Supreme Court has imposed on manufacturers and distributors. In the absence of any suggestion that a trademark violation should not be treated as a common law tort, we believe that the Inwood Labs. test for contributory liability applies. CSI may be liable for trademark violations by Parvez if it knew or had reason to know of them. But the factual findings must support that conclusion.
 
 
 25
 The district court found CSI to be willfully blind. Since we have held that willful blindness is equivalent to actual knowledge for purposes of the Lanham Act, Lee, 875 F.2d at 590, this finding should be enough to hold CSI liable (unless clearly erroneous). But we very much doubt that the district court defined willful blindness as it should have. To be willfully blind, a person must suspect wrongdoing and deliberately fail to investigate. Id. The district court, however, made little mention of CSI's state of mind and focused almost entirely on CSI's failure to take precautions against counterfeiting. Mem.Op. at 5-6. In its conclusions of law, the court emphasized that CSI had a duty to take reasonable precautions. Mem.Op. at 7. In short, it looks as if the district court found CSI to be negligent, not willfully blind.
 
 
 26
 This ambiguity in the court's findings would not matter if CSI could be liable for failing to take reasonable precautions. But CSI has no affirmative duty to take precautions against the sale of counterfeits. Although the "reason to know" part of the standard for contributory liability requires CSI (or its agents) to understand what a reasonably prudent person would understand, it does not impose any duty to seek out and prevent violations. Restatement (Second) of Torts § 12(1) & cmt. a (1965). We decline to extend the protection that Hard Rock finds in the common law to require CSI, and other landlords, to be more dutiful guardians of Hard Rock's commercial interests. Thus the district court's findings do not support the conclusion that CSI bears contributory liability for Parvez's transgressions.
 
 
 27
 Before moving on, we should emphasize that we have found only that the district court applied an incorrect standard. We have not found that the evidence cannot support the conclusion that CSI was in fact willfully blind. At the Tri-State, Barelli saw Parvez's shirts and had the opportunity to note that they had cut labels and were being sold cheap. Further, Barelli testified that he did not ask vendors whether their goods were counterfeit because they were sure to lie to him. One might infer from these facts that Barelli suspected that the shirts were counterfeits but chose not to investigate.
 
 
 28
 On the other hand, we do not wish to prejudge the matter. For it is undisputed that Hard Rock made no effort to broadcast the information that legitimate Hard Rock t-shirts could only be found in Hard Rock Cafes. Moreover, there does not seem to be any particular reason to believe that inexpensive t-shirts with cut labels are obviously counterfeit, no matter what logo they bear. Cf. Lee, 875 F.2d at 590 (genuine Vuitton and Gucci bags unlikely to display poor workmanship or purple vinyl linings). The circumstantial evidence that Barelli suspected the shirts to be counterfeit is, at best, thin. On remand, the district court may choose to develop this issue more fully.
 
 
 29
 Perhaps recognizing that the district court's opinion is unclear, Hard Rock urges us to find CSI vicariously liable for Parvez's sales, regardless of its knowledge of the counterfeiting. Indeed, if we accept this theory, CSI is liable for Parvez's sales even if it was not negligent.[3] See, e.g., Shapiro, Bernstein & Co. v. H.L. Green Co., 316 F.2d 304, 309 (2d Cir.1963).
 
 
 30
 We have recognized that a joint tortfeasor may bear vicarious liability for trademark infringement by another. David Berg, 884 F.2d at 311. This theory of liability requires a finding that the defendant and the infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product. Id. The case before us does not fit into the joint tortfeasor model, and Hard Rock does not argue that it does.
 
 
 31
 Instead, Hard Rock wants us to apply the more expansive doctrine of vicarious liability applicable to copyright violations. Under the test developed by the Second Circuit, a defendant is vicariously liable for copyright infringement if it has "the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." Gershwin Publishing Corp. v. Columbia Artists Management, Inc., 443 F.2d 1159, 1162 (2d Cir.1971) (hereinafter CAMI ); F.E.L. Publications, Ltd. v. National Conf. of Catholic Bishops, 466 F.Supp. 1034, 1040 (N.D.Ill.1978); see also Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co., 36 F.2d 354, 355 (7th Cir.1929) (owner of dance hall liable for copyright violations by band hired to entertain paying customers); Famous Music Corp. v. Bay State Harness Horse Racing & Breeding Ass'n, 554 F.2d 1213, 1215 (1st Cir.1977) (owner of racetrack liable for copyright violations by company hired to supply music over public address system). The purpose of the doctrine is to prevent an entity that profits from infringement from hiding behind undercapitalized "dummy" operations when the copyright owner eventually sues. Shapiro, Bernstein, 316 F.2d at 309.
 
 
 32
 The parties have argued vigorously about the application of this doctrine to the facts.[4] But we need not decide the question; for the Supreme Court tells us that secondary liability for trademark infringement should, in any event, be more narrowly drawn than secondary liability for copyright infringement. Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 439 n. 19, 104 S.Ct. 774, 787 n. 19, 78 L.Ed.2d 574 (1984) (citing "fundamental differences" between copyright and trademark law). If Hard Rock referred us to some principle of common law that supported its analogy to copyright, we would be more understanding of its claims. But it has not. Further, there is no hint that CSI is playing at the sort of obfuscation that inspired the Second Circuit to develop its more expansive form of vicarious copyright liability. Hard Rock must look to Congress to provide the level of protection it demands of CSI here.
 
 
 33
 In sum, we find that CSI may bear contributory liability for Parvez's unlawful sales, but we see no evidence on the record that would support a finding that CSI is vicariously liable. Accordingly, because the district court's findings fail to establish that CSI knew or had reason to know that Parvez was selling counterfeits, we must vacate the judgment against CSI and remand for further proceedings.B. Injunctive Relief
 
 
 34
 CSI argues that entry of a permanent injunction is inappropriate even if it is liable, because there is no reason to believe that it will permit more vendors to infringe Hard Rock's trademarks. In this Circuit, however, "[i]t is within the discretion of the trial court to grant or deny an injunction against conduct which has ceased and is not likely to recur." Schutt Mfg. Co. v. Riddell, Inc., 673 F.2d 202, 207 (7th Cir.1982); Scotch Whisky Ass'n v. Barton Distilling Co., 489 F.2d 809, 813 (7th Cir.1973). More generally, a plaintiff in a trademark case:
 
 
 35
 is entitled to effective relief; and any doubt in respect of the extent thereof must be resolved in its favor as the innocent producer and against the [defendant], which has shown by its conduct that it is not to be trusted.
 
 
 36
 Polo Fashions, Inc. v. Dick Bruhn, Inc., 793 F.2d 1132, 1135 (9th Cir.1986) (quoting William R. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 532, 44 S.Ct. 615, 618, 68 L.Ed. 1161 (1924)); see also Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 130, 67 S.Ct. 1136, 1139, 91 L.Ed. 1386 (1947); 2 J. Thomas McCarthy, Trademarks and Unfair Competition § 30:2 at 466 (2d ed. 1984). On remand, if the district court finds that CSI is liable, the entry of an appropriate injunction will again be within its discretion. To paraphrase the Ninth Circuit: if CSI sincerely intends not to permit the sale of Hard Rock merchandise at its flea markets, the injunction harms it little; if it does, the injunction gives Hard Rock substantial protection of its trademarks. Polo Fashions, 793 F.2d at 1135-36.
 
 C. Attorney's Fees
 
 37
 Section 35 of the Lanham Act, 15 U.S.C. § 1117 (1988), provides that prevailing plaintiffs may be awarded attorney's fees in two circumstances. If a defendant has sold counterfeit goods by mistake or through negligence, attorney's fees may be awarded "in exceptional circumstances." § 1117(a). But if the violation "consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark," treble damages and attorney's fees must be awarded unless there are "extenuating circumstances." § 1117(b). Willful blindness is sufficient to trigger the mandatory provisions of subsection b. Lee, 875 F.2d at 590.
 
 
 38
 1. Concession Services, Inc.
 
 
 39
 In response to Hard Rock's claim for attorney's fees, CSI argues that it cannot be liable for mandatory attorney's fees under subsection b because even if it is a contributory infringer, it did not "intentionally us[e]" a counterfeit mark. We reject this argument. If CSI can bear contributory liability under substantive provisions that impose liability on those who "use[ ]" a counterfeit mark "in commerce," 15 U.S.C. §§ 1114 & 1125 (sections 32 and 43 of the Act), there is no reason to believe that it cannot "intentionally us[e]" a counterfeit within the meaning of section 35(b).
 
 
 40
 On remand, if the district court finds CSI liable as a contributory infringer, it should consider whether its findings also amount to intentional use. If CSI is liable because it knew that the t-shirts were counterfeit, or because it was willfully blind, an award of attorney's fees is mandatory under section 35(b). If, however, CSI is liable, but only because it had "reason to know" that the shirts were counterfeits,[5] then the district court should award attorney's fees only if it finds that the circumstances were exceptional.
 
 
 41
 Finally, CSI also argues that Hard Rock failed to come up with competent evidence to support an award of attorney's fees and that it already received its fees when it settled with the primary infringer, Parvez. But since the district court refused to award attorney's fees, it never had a chance to pass on these questions. We decline to do so here and leave these arguments for the district court on remand.
 
 2. Harry's Sweat Shop
 
 42
 The district court's findings about Harry's suffer from the same defect as the findings about CSI. It is simply not clear whether the court used the phrase "willful blindness" to mean that Harry's suspected the goods were counterfeit but decided not to investigate or to mean that Harry's failed to take precautions. The evidence would support either conclusion. Unfortunately, because of the ambiguity, we must remand this question as well, although the finding of liability stands.[6] If the district court finds that Harry's was willfully blind as to the counterfeit nature of the t-shirts it sold, it must award attorney's fees to Hard Rock under section 35(b). Only if Harry's was not willfully blind does the "exceptional circumstances" standard from section 35(a) apply.[7]
 
 III.
 
 43
 For the foregoing reasons, we VACATE the finding of liability as to CSI, VACATE the denial of Hard Rock's request for attorney's fees against both defendants and REMAND for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable John W. Reynolds, Senior District Judge for the Eastern District of Wisconsin, is sitting by designation
 
 
 [1]
 The parties loudly dispute the purpose of the rule against selling food and beverages. CSI characterizes the rule as a safety rule. CSI Br. at 12. Hard Rock contends that the rule is designed to protect CSI's concession sales from competition. Hard Rock Br. at 4. But resolving the dispute is not necessary, or even helpful, to deciding the issues before us
 
 
 [2]
 CSI contends that the testimony was not competent evidence because it was not based on first-hand knowledge. Nonetheless, no evidence suggests that the shirts seized from Parvez and Harry's came from Winterland
 
 
 [3]
 Unfortunately, counsel for both sides have done their best to confuse this issue. Although the type of vicarious liability that Hard Rock advocates is a form of strict liability, Hard Rock continues to assert CSI's negligence as an element of its case. Either because it did not realize the incongruity in Hard Rock's position, or because it did not wish to discuss the possibility of strict liability, CSI has offered us no assistance on this point. Nor has CSI pointed out that Hard Rock appears to have waived its argument for strict liability in the proceedings below. Accordingly, CSI has waived Hard Rock's waiver, and we must forge through the thickets unguided
 
 
 [4]
 We are inclined to favor CSI's side of the dispute. CSI neither hired Parvez to entertain its customers, cf. Dreamland Ball Room, 36 F.2d at 355, nor did it take a percentage of his sales, cf. Shapiro, Bernstein, 316 F.2d at 306 (department store took 10%-12% of record department's gross receipts); CAMI, 443 F.2d at 1161 (management company took percentage of infringer's performance fees). Further, whether CSI is a landlord or a licensor, CSI exercises no more control over its tenants than any landlord concerned with the safety and convenience of visitors and of its tenants as a group. Deutsch v. Arnold, 98 F.2d 686, 688 (2d Cir.1938) (ignorant landlord not liable for copyright infringement by tenant)
 
 
 [5]
 We realize that finding the line between "willful blindness" and "reason to know" may be like finding the horizon over Lake Michigan in a snowstorm. Nonetheless, we emphasize that the former is a subjective standard--what did Barelli suspect, and what did he do with his suspicion?--whereas the latter is an objective standard--would a reasonably prudent man in Barelli's shoes have known that the t-shirts were counterfeits? See 2 J. Thomas McCarthy, Trademarks and Unfair Competition § 25:2 at 246 (2d ed. 1984)
 
 
 [6]
 We note in passing that the district court did not have to find that Harry's was willfully blind to establish its liability. Sellers bear strict liability for violations of the Lanham Act. Henri's Food Products Co. v. Kraft, Inc., 717 F.2d 352, 359 (7th Cir.1983); Tisch Hotels, Inc. v. Americana Inn, Inc., 350 F.2d 609, 613 (7th Cir.1965)
 
 
 [7]
 Harry's also argues that Hard Rock failed to present competent evidence to support an award of fees. Again, we leave the resolution of this issue to the district court