**MONSANTO COMPANY and The Nutrasweet Company,**
**Plaintiffs,**

v.

**Fausto J. CAMPUZANO,**
**et al., Defendants.**

**No. 99–2082–CIV.**

United States District Court,
S.D. Florida,
Miami Division.

May 29, 2002.

Keith Mack, Miami, FL, for Monsanto Co.

Rodney A. Brown, Brown & Fox, New York City, and Alan Rosenthal, Adorono & Zeder, Miami, FL, for Merisant Co.

Jed L. Frankel and Jeremy Adam Koss, Phillips, Eisinger, Koss & Brown, Hollywood, FL, for Fausto J. Campuzano, Maria Campuzano, F. Garcia Wholesale & Export, Inc.

Steven Fine, Fort Lauderdale, FL, for Mark Siegel, Kathleen M. Siegel, Trio Intern. Trading, Inc.

Michael B. Chesal, Kluger Peretz Kaplan & Berlin, Miami, FL, Ricardo Alberto Reyes, Tobin & Reyes, Boca Raton, FL, for Countywide of Miami, Inc.

Steven Herbert Hibbe, Miami, FL, for Jose I. Arguelles, Sylvia B. Arguelles, Trapeza Overseas, Inc., Intrasit Services, Inc.

Francis Xavier Santana, Miami, FL, for Carlos Casanova.

Carlos Ramiro Caso, Miami, FL, for Alvaro Buendia.

C. Vincent LoCurto, Fort Lauderdale, FL, for Sun Container, Inc.

### ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF THE F. GARCIA DEFENDANTS

JORDAN, District Judge.

Merchant seeks a permanent injunction restraining the defendants' sale and distribution of Equal tabletop sweetener, as well as monetary relief for alleged trademark and copyright infringement, false designation of origin, false description and dilution, unjust enrichment, and Florida law claims of unfair competition, injury to business reputation, dilution of the distinctive quality of its trademarks, and participation in unconscionable, unfair, and deceptive acts or practices.

The defendants Fausto J. Campuzano, Maria Campuzano and F. Garcia Wholesale & Export, Inc. (F. Garcia defendants) move for summary judgment against Merisant. Federal jurisdiction exists pursuant to 15 U.S.C. § 1121(a), 17 U.S.C. § 101 et seq. and 28. U.S.C. §§ 1331, 1338 and 1367.

For the reasons which follow, the F. Garcia defendants' motion for summary judgment [D.E. 134] is GRANTED.

### I. SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one that might affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the non-moving party fails to prove an essential element of its case for which is has the burden of proof at trial, summary judgment is warranted. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Hilburn v. Murata Elecs. North Am. Inc., 181 F.3d 1220, 1225 (11th Cir.1999). Thus, the task is to determine whether, considering the evidence in the light most favorable to Merisant, there is evidence on which the trier of fact could reasonably find a verdict in its favor. See Liberty Lobby, 477 U.S. at 251, 106 S.Ct. 2505; Hilburn, 181 F.3d at 1225; Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir.1997).

## II. UNDISPUTED RELEVANT FACTS[1]

Fausto Campuzano worked for Hunt–Wesson since 1972. *See* Deposition of Fausto Campuzano at 8 [D.E. 163, 164, 165, 166][2]. While he was at Hunt–Wesson, he sold institutionally packaged Equal to a large food service concern, Henry Lee, as well as to smaller Latin distributors including Restaurant Depot, Jetro Cash & Carry, and Leovenar. *See id.* at 14, 17, 18.

Mr. Campuzano became the owner of F. Garcia Wholesale & Export, a food service products company originally owned by his father, in November of 1997. *See id.* at 33. His wife, Maria Campuzano is the secretary/treasurer of the company and Mr. Campuzano's son and mother occasionally help out. *See id.* at 121, 122, 127. The company's main office is at Mr. Campuzano's home. *See id.* at 122.

After Mr. Campuzano became president of F. Garcia, the company purchased cases of institutionally packaged Equal sweetener from suppliers of the product in the United States and sold it to customers in the United States. Although Mr. Campuzano had worked at Hunt–Wesson for many years, and Hunt–Wesson distributed Equal, F. Garcia did not purchase the Equal product from Hunt–Wesson. *See id.* at 53. Instead, Mr. Campuzano made payments to Louis Lubitz, a Hunt–Wesson sales representative who helped to make extra quantities of promotionally priced Equal product available to Kansas Marine, where F. Garcia purchased it. *See id.* at 80–81, 107, 157–58, 173, 218–20. Mr. Campuzano paid Mr. Lubitz by writing checks to both Mr. Lubitz and to Mr. Lubitz's wife. *See id.* at 220. F. Garcia stored the boxes of Equal it purchased at a warehouse it leased from Sari Express, Inc., and hired Casanova Trucking to pick up the Equal product from Kansas Marine, transport it to Sari's warehouse, and then ship it to customers who were the eventual purchasers.

F. Garcia sold Equal to a number of different entities which made lawful use of the Equal that they purchased from F. Garcia, including B.C. Coffee, Sysco, Cheney Brothers, Beaver Street Foods, and Purity Condiments. *See id.* at 106, 135–36. Prior to Mr. Campuzano's ownership of F. Garcia, he sold Equal to Restaurant Depot, Sysco, Jetro, and a coffee distributor. *See id.* at 42. Though Mr. Campuzano was aware of export departments in those companies, and he thought that they would sell Equal for export, he was not aware of the "intimate operations" of the companies and whether or not they actually sold the Equal product for export. *See id.*

F. Garcia also sold Equal to the Trio defendants (Trio International and its owner Mark Siegel). The Equal packaging was not changed from the time F. Garcia purchased the Equal up to the time of delivery to Trio. F. Garcia had no control over Trio's subsequent use of Equal, nor did F. Garcia ever make any kind of investment in Trio. *See id.* at 140. Though the Trio defendants and Alvaro Buendia repackaged the Equal product into counterfeit boxes which the Trio defendants sold to food service purchasers, the repackaging was not done at the Sari ware-

---

1. Under Local Rule 7.5, all material facts set forth in the statement served by the moving party are deemed admitted unless controverted by the opposing party's statement. Unless otherwise noted, these facts include those set forth in the F. Garcia defendants' statement of Material facts, which are undisputed for purposes of this summary judgment motion to the extent that they have not been controverted by Merisant.

2. Fausto Campuzano's deposition is broken into four separate, sequential docket entries.

house or any warehouse facility in any way connected with F. Garcia.[3]

## III. DISCUSSION

██ "If a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorily responsible for any harm done as a result of their deceit." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 854, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). On the other hand, the mere sale of a genuine trademarked product without the trademark owner's consent does not violate the Lanham Act, 15 U.S.C. §§ 1114, 1125. *See Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.,* 988 F.2d 587, 593 (5th Cir.1993); *NEC Electronics v. CAL Circuit Abco,* 810 F.2d 1506, 1509 (9th Cir. 1987).

It is undisputed, for purposes of this summary judgment motion, that the Trio defendants and Mr. Buendia engaged in a scheme to repackage Equal product that was originally packaged for the institutional food service market and to sell it for distribution to the retail market. It is also undisputed, for purposes of this summary judgment motion, that this scheme included the creation of counterfeit Equal retail boxes which infringed the Merisant trademarks and copyrights.

Merisant argues that the F. Garcia defendants are contributorily liable for the unauthorized counterfeiting and distribution of the Equal product, because knowing of the scheme, or alternatively, remaining willfully blind to it, they sold large quantities of Equal product to the Trio defendants and Mr. Buendia. *See* Opposition to Motion for Summary Judgment at 14 [D.E. 173]. In other words, if the F. Garcia defendants either intentionally induced the Trio defendants and Mr. Buendia to engage in the counterfeit repackaging scheme, or continued to sell the Equal product to the Trio defendants and Mr. Buendia after discovering they were involved in the infringement of Merisant's trademarks and copyrights, the F. Garcia defendants are contributorily liable for the infringing activity.

██ There is no material fact at issue other than whether or not the F. Garcia defendants knew about the infringement or should have known about it (that is, remained willfully blind). While it is true that a party's state of mind—including whether a party has knowledge of infringing activity or has remained willfully blind—is usually a question of fact to be determined after trial, this is so only if a reasonable jury could "certainly not reach a contrary conclusion." *See Chanel, Inc. v. Italian Activewear of Florida, Inc.,* 931 F.2d 1472, 1476 (11th Cir.1991), Merisant does not point to any direct evidence that the F. Garcia defendants knew of the repackaging scheme (and indeed, I can not find any in the record) but it argues that the following adds up to circumstantial evidence of the F. Garcia defendants' knowledge: (i) the F. Garcia defendants sold "massive" quantities (i.e., no less than a total of 52,520 cases) of Equal product to the Trio defendants and Mr. Buendia; (ii) the F. Garcia defendants were the only source of Equal product for those defendants and Mr. Buendia and they were Mr. Campuzano's largest account for the Equal

---

**3.** Summary judgment in favor of Merisant on liability was granted in part on April 25, 2002, against Mr. Buendia, and on May 3, 2002, against Trio defendants. [D.E. 300, 302, 303]. Those orders contain a detailed discussion of Merisant's copyright and trademark infringement claims.

product he sold; (iii) though Mr. Campuzano testified that he knew the nature of the business of his other customers because he did business with them when he was employed by Hunt–Wesson, he never asked Mr. Buendia and the Trio defendants the nature of their business; (iv) Mr. Campuzano made undisclosed pay-offs in order to facilitate his purchase of Equal product that he sold to the Trio defendants and Mr. Buendia; (v) Mr. Campuzano was aware of a repackaging scheme that had taken place in New York; (vi) Mr. Campuzano (according to Merisant) attempted to conceal F. Garcia's participation in the counterfeiting scheme by advising his trucking company, Casanova Trucking, not to disclose where the Equal product was being delivered; (vii) though Mr. Campuzano worked for Hunt–Wesson for over 25 years, he did not purchase Equal product from Hunt–Wesson, which was a distributor of Equal, but purchased it from other distributors; (viii) Mr. Campuzano's testimony and Mr. Siegel's testimony differed on the issue of whether Mr. Campuzano negotiated the price for the Equal product with Mr. Siegel or with Mr. Buendia; (ix) Mr. Buendia and Mr. Campuzano were friends for over 12 years; and (x) the counterfeiting operation could not have taken place without F. Garcia supplying the institutional Equal product.

Unfortunately for Merisant, none of these facts, even taken together, gives a reasonable finder of fact enough circumstantial evidence of knowledge or willful blindness on the part of Mr. Campuzano upon which to find for Merisant. Indeed, to be "willfully blind" for liability under the Lanham Act, 15 U.S.C. §§ 1114(1)(a, b), 1125(a) "a person must suspect wrongdoing and deliberately fail to investigate." *See Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143, 1149 (7th Cir.1992). As the Seventh Circuit in *Hard Rock* pointed out, the doctrine of contributory liability does not impose an affirmative duty on a manufacturer or distributor to seek out and prevent violations or take precautions against the sale of counterfeit product. *See id.* The standard, rather, is "to understand what a reasonably prudent person would understand." *Id.* Nothing in this record, taken in the light most favorable to Merisant, would permit a reasonable trier of fact to find that Mr. Campuzano or the F. Garcia defendants should have suspected wrongdoing yet deliberately failed to investigate.

For example, Merisant points to the relationship between Mr. Campuzano and Mr. Buendia as circumstantial evidence that Mr. Campuzano knew of the repackaging scheme. Mr. Campuzano testified that he first met Mr. Buendia sometime between 1985 and 1988 when someone at Hunt–Wesson sent him Mr. Buendia's name as a lead. *See* Campuzano Deposition at 26. At that time, Mr. Buendia was in the business of exporting product to South America, but nothing materialized from that first meeting. *See id.* at 27. Other than casual encounters, the next time Mr. Campuzano met Mr. Buendia was in late 1997 or early 1998. *See id.* at 29. Mr. Buendia testified that until Mr. Campuzano's sale of Equal product to him that is the subject of this action, Mr. Campuzano and Mr. Buendia had never done any business together. *See* Deposition of Alvaro Buendia at 71 [D.E. 217]. So while it is true that Mr. Buendia and Mr. Campuzano knew each other over a 12 to 15 year period, there is nothing in the record that refutes the fact that, other than casual encounters, Mr. Buendia and Mr. Campuzano rarely saw each other during that time. There is simply no factual support for Merisant's allegation that the two had a "close former relationship."

Although Merisant makes much of the "fact" that Mr. Campuzano knew about his

other customers' business but not about the business of Mr. Siegel and Mr. Buendia, the record reflects the opposite. Mr. Campuzano testified that he understood that Mr. Buendia and Mr. Siegel intended to export the Equal product. In fact, during his deposition, when Mr. Campuzano was asked if other customers had ever told him they were planning to export Equal product purchased from him, he explained that they did not. "Sometimes they say, you know: I want to export this or that, but, you know, regarding Equal, I was never told they wanted it for export or not until [Mr. Siegel and Mr. Buendia] came about." Campuzano Deposition at 89. Specifically, Mr. Campuzano testified that in late 1997 or early 1998, Mr. Buendia contacted him to tell him that, together with Mr. Siegel, Mr. Buendia had the opportunity to export Equal to Columbia and was interested in Mr. Campuzano supplying them with Equal product. *See id.* at 44. Mr. Campuzano also testified that from the time of his initial conversation with Mr. Siegel to the time that the first Equal product was picked up at the warehouse, Mr. Siegel told Mr. Campuzano that he wanted to export the product to Columbia. *See id.* at 51, 57. Additionally, Mr. Buendia testified that he spoke with Mr. Campuzano about products that could be exported to other countries, including the Equal product he proposed to buy from Campuzano. *See* Buendia Deposition at 77–84. Mr. Buendia also explained that Mr. Campuzano knew that Mr. Buendia was an exporter. *See id.* at 81. Moreover, when asked again whether he specifically told Mr. Campuzano that he planned to export the Equal product, Mr. Buendia stated that Mr. Campuzano did not know that the product was going to be repack-

aged. *See id.* at 83. Taking this testimony in the light most favorable to Merisant, it appears that Mr. Buendia was, at the very least, explaining that he told Mr. Campuzano the product was to be exported.[4] Thus, it seem that Mr. Campuzano was, in fact, aware of the general nature of Mr. Buendia's and Mr. Siegel's business. Moreover, nothing in this record would lead a reasonable fact-finder to believe that Mr. Campuzano had reason to suspect the product he was selling to Mr. Buendia and Mr. Siegel was not going to be exported to Columbia. As the Supreme Court has explained: "The supplier's duty does not go so far as to require him to refuse to sell to dealers who merely *might* pass off its goods." *Inwood Laboratories, Inc.*, 456 U.S. at 861, 102 S.Ct. 2182 (1982) (White, J., concurring) (quoting 2 J. McCarthy, Trademarks and Unfair Competition § 252 (1973)).

Merisant further claims that F. Garcia sold "massive" quantities of Equal product to the Trio defendants and Mr. Buendia, and that Mr. Campuzano did not purchase the product from his old employer, Hunt–Wesson because buying such a large quantity of product, in order to sell it to exporters, would have aroused suspicion. Mr. Campuzano testified that he purchased the Equal product from other companies because it allowed him to take advantage of price promotions that Hunt–Wesson did not offer. *See* Campuzano Deposition at 78–86. But Merisant contends that if the transactions were legitimate, F. Garcia should have been able to obtain a "good" price from Hunt–Wesson. There is, however, nothing in the record that supports what amounts to sheer speculation on the part of Merisant. Moreover, Mr. Lubitz

---

4. During Mr. Buendia's deposition there were objections to Mr. Buendia's testimony from Merisant's counsel regarding the issue of whether Mr. Buendia told Mr. Campuzano that he planned to export the Equal product, but I do not find those objections to be well-founded.

testified that when Mr. Campuzano began requiring larger amounts of Equal product, Mr. Campuzano, Mr. Lubitz, and Earl Williams, a NutraSweet/Equal employee (and a division or regional manager of Equal), met together to discuss the purchase of Equal product by F. Garcia. *See* Deposition of Louis Lubitz at 14 [D.E. 201]. Mr. Lubitz testified that because Kansas Marine had a more advantageous pricing structure in place for cruise lines, and Mr. Williams could not get the same price structure directly from Hunt–Wesson, the decision was made to sell the Equal product to Mr. Campuzano through Kansas Marine. *See id.* at 15, 54. Mr. Lubitz explained that it was Mr. Williams' decision to have Mr. Campuzano continue to buy through Kansas Marine. *See id.* at 76, 77. Mr. Lubitz further testified that when Mr. Campuzano would call him to request a large shipment of Equal, Mr. Lubitz would coordinate the, timing with Mr. Williams in order to take advantage of "allowances" or pricing discounts. *See id.* at 67. Finally, Mr. Lubitz testified that Mr. Campuzano told both Mr. Lubitz and Mr. Williams that the Equal being purchased was for a customer that was going to export it to Colombia. *See id.* at 16, 69, 91. Mr. Lubitz never asked Mr. Campuzano who was exporting customer was:

> Q. And you never pushed Mr. Campuzano for more details about his large client who was exporting to Colombia?
>
> A. No. I have many customers selling lots of products in lots of places and I

had no cause to question, you know, what was being—we export a lot of product out of South Florida into Colombia, Mexico, the whole Caribbean.

*See id.* at 92.

Nevertheless, Merisant claims that its "suspicion" that Mr. Campuzano knew that such large quantifies would have aroused attention at Hunt–Wesson is buttressed by the fact that Mr. Campuzano admitted making undisclosed "pay offs" to Mr. Lubitz while he was still at Hunt–Wesson. But according to Mr. Lubitz's testimony, once Mr. Campuzano began ordering large quantities of Equal product from Kansas Marine, and began paying Mr. Lubitz "brokerage fees," Mr. Williams, a Nutra-Sweet employee, was involved in either approving or facilitating the purchases. *See id.* at 15–16, 69, 76–77. Whether the payments to Mr. Lubitz were appropriate or ethical, such payments do not constitute evidence that Mr. Campuzano knew of the repackaging scheme of Mr. Buendia and Mr. Siegel. Nor is it evidence that the purchase of large quantities would have aroused suspicion at Hunt–Wesson. Again, Merisant is engaging in speculation, and not offering "significant, probative evidence." *See Chanel*, 931 F.2d at 1475. Things might be different if Mr. Williams contradicted Mr. Lubitz on these matters, but there is no deposition or affidavit of Mr. Williams in the record.[5]

Merisant says that F. Garcia was the only source of Equal product for the Trio

---

5. Merisant's investigator, Michael Kessler, testified that he interviewed Mr. Williams at his home in Georgia. *See* Deposition of Michael Kessler at 209 [D.E. 254]. Mr. Kessler testified that Mr. Williams "emphatically" denied that he had any responsibility or involvement in connection with authorizing or telling Mr. Lubitz to sell product to F. Garcia and that he was a paper man and merely went through reports. *See id.* at 210–11. Mr. Kessler did not recall whether he took notes during the interview, did not ask Mr. Williams to provide any documentation, and did not recall whether Mr. Williams told him that it wasn't part of his job responsibility to be involved in sales. *See id.* at 211. Mr. Kessler's testimony regarding his conversation with Mr. Williams is hearsay, and as such, can not be considered as evidence contradicting Mr. Lubitz's and Mr. Campuzano's testimony.

defendants and Mr. Buendia, and that they were Mr. Campuzano's largest account for the Equal product he sold. But there is no evidence that the Trio defendants and Mr. Buendia could not have obtained Equal product elsewhere if they so desired. Rather, there is evidence in the record that they approached other distributors at trade shows and inquired about buying Equal product elsewhere. *See* Campuzano Deposition at 92. Taking this evidence in the light most favorable to Merisant, at the very least this suggests that Equal product was available elsewhere if the price—and the relationships— were right. Furthermore, there is testimony in the record that others in the business also knew that Mr. Campuzano was selling large quantities of Equal product. *See id.* at 87.

Merisant asserts that Mr. Campuzano's awareness of another repackaging scheme taking place in New York is evidence of his knowledge or willful blindness that the large quantities of product he was selling to Mr. Buendia and Mr. Siegel were intended for repackaging.[6] But this fact, even in light of all the other facts Merisant alleges to show knowledge or willful blindness, does not create an issue for the trier of fact. Everyone who ever sold or purchased Equal product may have been aware of the New York scheme, but that does not make them contributoriallyliable. In fact, Mr. Lubitz, who is not a defendant in this case, also testified that he was aware of the New York repackaging scheme. *See* Lubitz Deposition at 108. Evidence that Mr. Campuzano had knowledge that at some time unknown individuals engaged in an unrelated repackaging scheme in another state is not evidence

that Mr. Campuzano knew or should have known that Mr. Buendia and Mr. Siegel were engaged in a similar scheme.

Mr. Campuzano, according to Merisant, also attempted to conceal F. Garcia's participation in the counterfeiting scheme by advising his trucking company, Casanova Trucking, not to disclose where the Equal product was being delivered. But there is testimony in the record that this was, if not common practice in the industry, also not unheard of either, and was a practice intended to protect middlemen like Mr. Campuzano from being cut out:

Q. And you were not supposed to let Kansas Marine know where the Equal was going? Those were your instructions from Mr. Campuzano?

A. That's correct.

Q. Did Mr. Campuzano ever explain to you why he did not want Kansas Marine Company to know where the Equal was being delivered?

A. We've—I have, you know, like every other shipment is a blind shipment, that's their concern is so that party A does not know where the stuff came from, as far as not knowing where they picked it up, as far as—I know it's for reasons that they can do directly to wherever and buy the stuff directly from them, is my understanding of that.

Q. Is that what Mr. Campuzano said to you in connection with Equal?

A. I don't know if I ever did ask him that question, you know; but, you know, normally, in the trucking industry, whenever somebody or anybody—I mean, somebody tells you something, do it, you know? Blind shipment, you know what it is, so you don't—I mean, you

---

6. Mr. Campuzano actually testified that he was aware of a scheme which took place in New Jersey, but when asked if it was in Brooklyn instead, he agreed that it was either

in Brooklyn or New Jersey, but he didn't remember which location. *See* Campuzano Deposition at 222, 223.

don't ask questions or you don't question: Why are you doing this?

\* \* \* \* \* \*

Q. Were all the products that you picked up for Garcia done on a blind shipment basis?

A. I would say at least a good 80 percent of them were.

\* \* \* \* \* \*

Q. And your company cooperated with Garcia in connection with carrying out these instructions?

A. We cooperate in the sense of blind shipments; not just for Garcia, for any other shipper or broker.

Deposition of Carlos Casanova at 66–68 [D.E. 215].

The fact that Mr. Campuzano's testimony and Mr. Siegel's testimony differed on the issue of whether Mr. Campuzano negotiated the price for the Equal with Mr. Siegel or with Mr. Buendia is also not evidence that Mr. Campuzano knew or should have known of a repackaging scheme.

Finally, while it is true that the counterfeiting operation was made possible by the purchase of large quantities of Equal product, the record does not support Merisant's allegation that it could not have taken place without F. Garcia supplying that Equal product. As noted above, there were other companies involved in the sale of the product, and in fact, evidence in the record that, had it not been for Kansas Marine wanting to keep its business rela-

tionship with Mr. Campuzano (and presumably with Mr. Lubitz), it might have sold the product directly to Mr. Buendia and Mr. Siegel.[7]

## IV. CONCLUSION

In sum, Merisant has not presented evidence sufficient to allow a reasonable finder of fact to find in its favor. Rather, Merisant has offered speculation, but this is "not the kind of significant, probative evidence necessary to withstand summary decision." *See Chanel*, 931 F.2d at 1475. Nothing in the record permits a reasonable inference that F. Garcia, Fausto, or Maria Campuzano knew or should have known about the infringing activity of Mr. Buendia and the Trio defendants. Counts I, II, III, IV, V, and VI of Merisant's complaint would require such knowledge or willful blindness for a finding of liability against the F. Garcia defendants. Accordingly, summary judgment is GRANTED on those counts in favor of Fausto Campuzano, Maria Campuzano and F. Garcia Wholesale & Export, Inc. Because Florida's anti-dilution statute, Fla.Stat. § 495.151, is inapplicable to Merisant's marks being copies by unauthorized individuals on boxes containing genuine Equal product, summary judgment is also granted in favor of the F. Garcia defendants as to Count VII. Finally, summary judgment is granted in favor of the G. Garcia defendants as to Count VIII because Merisant lacks standing to bring a claim under the Florida Deceptive and Unfair Trade Practices Act, Fla.Stat. § 501.204.[8] A final

---

**7.** My separate discussion of the different facts asserted by Merisant should not be seen as a failure to consider those facts in the aggregate. I have analyzed the facts collectively, but even under such an analysis there is insufficient evidence in the record to let the contributory infringement claims against the F. Garcia defendants go to the jury. *See Piccoli A/S v. Calvin Klein Jeanswear Co.,* 19

F.Supp.2d 157, 173–74 (S.D.N.Y.1998) ("'[T]here must be a finding that the defendant and the direct infringer 'have an apparent or actual partnership, have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product.'").

**8.** For a more complete description of the reasons for granting summary judgment to the F.

judgment will issue by separate order at a later time.

DONE and ORDERED in chambers in Miami, Florida, this 29th day of May, 2002.

---

Garcia defendants on Counts VII and VIII, see my orders of April 25, 2002, and of May 2, 2002, denying Merisant's summary judgment motion on Count VII and granting summary judgment in favor of Alvaro Buendia on Count VIII [D.E. 300, 303], and of May 2, 2002, denying Merisant's summary judgment motion on Count VII and granting summary judgment in favor of the Trio defendants on Count VIII [D.E. 302]. On May 29, 2002, I issued an amended order, granting summary judgment to the Trio defendants and to Alvaro Buendia on Count VII.