**DAVID BERG AND COMPANY,**
**Plaintiff–Appellant,**

v.

**GATTO INTERNATIONAL TRADING COMPANY, INC. and New England Foods International Corporation, Defendants–Appellees.**

**No. 88–3254.**

United States Court of Appeals, Seventh Circuit.

Argued June 2, 1989.

Decided Sept. 6, 1989.

---

Richard M. Kates, Chicago, Ill., for David Berg & Co., plaintiff-appellant.

Michael R. Levinson, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for Gatto Intern. Trading Co., Inc. and New England Foods Intern. Corp., defendants-appellees.

Before POSNER and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

MANION, Circuit Judge.

David Berg and Company (Berg) manufactures and sells meat products. Berg is suing Gatto International Trading Company, Inc. (Gatto), and New England Foods International Corporation (New England) for infringing Berg's trademark. The district court held that Berg had failed as a matter of law to prove the existence of any basis upon which to hold either Gatto or New England contributorily responsible for a fourth party's trademark infringement, and that Berg had also failed as a matter of law to meet its burden of proving any likelihood of product confusion. We affirm.

## I.

Berg manufactures and sells specialty meats, primarily sausage and other processed meats, throughout the United States. In March of 1984, an ammonia leak damaged a large quantity of Berg meat stored in a warehouse. Although the U.S. Department of Agriculture determined that the damaged meat was "safe, sound and wholesome and otherwise fit for human consumption," Berg concluded that the resulting discoloration and freezer burn did not meet the quality standards necessary to be sold under the Berg and related labels.

To identify its products, Berg used several trademarks registered with the United States Patent Office. Since the USDA found the meat (the meat products) fit for sale, Berg needed to salvage what it could, but did not want the meat products sold under the Berg labels.

To facilitate these objectives, by contract dated May of 1985, Berg transferred (directly and indirectly) the meat products to the Illinois Trading Company, a meat dis-

tributor. The contract contained restrictions that the meat products (with a few specific exceptions) would be sold outside the United States, and that no future sales or advertising for the meat products could use the David Berg name.[1] Soon thereafter Gatto agreed to purchase the meat products from ITC for $89,000. Included in the agreement was the provision that:

> Purchaser agrees that the finished goods will be sold outside the continental U.S.; except for the following lots: H–401, FM–68, I–5101, I–5105, I–5205, FM–1460. All advertising or use of David Berg name in future sales is forbidden.

New England financed Gatto's purchase. Gatto and New England had an agreement to divide the profits from the sale of the meat products on a 50/50 basis after payment of costs and repayment of financing. New England was to obtain export certificates for the meat products. Gatto was to market the product, collect funds from buyers, and remit to New England any funds due New England.

Gatto sold the meat products to Lake Erie Food Sales, Inc. (Lake Erie), a broker in Cleveland, Ohio. Gatto already had advised Lake Erie of the restrictions in the Gatto/ITC purchase agreement concerning sale of the meat products and exploitation of the Berg label. Although apparently neither Gatto nor New England sold any of the meat products to anyone (retail or wholesale), other than Lake Erie, Lake Erie nevertheless did sell an unspecified amount of the meat products within the United States. Some of these sales were made in cartons bearing the Berg label.

Berg sued Gatto and New England for trademark infringement. At trial Berg claimed that Gatto infringed on Berg's trademark as a result of Gatto's sale to Lake Erie and Lake Erie's subsequent sales in the United States. Berg presented no evidence regarding the quantity of the meat products sold by Lake Erie within the United States, the portion sold in relabelled cartons, the portion sold in cartons bearing Berg's label, or where in the United States these meat products had been sold. Berg presented no evidence (which the court determined credible) that any of Lake Erie's purchasers actually had been confused about the source or quality of their purchases.

Berg's Vice President of Corporate Affairs, who had responsibility for dealing with customer complaints, received no complaint from customers concerning these meat products. Berg's Vice President of Sales who also had dealt with customer complaints, had no knowledge of any complaints about these meat products. The only purchaser of some of these meat products to testify declared that neither he nor his own customers had any complaint regarding the quality of the meat products, and this purchaser still is a Berg customer.

Berg's President testified concerning the return of some of the meat products in St. Louis, Missouri. But Berg produced no documentation reflecting this alleged return, admitted that Berg had paid out no money on account of these meat products, and admitted that no customer (including this one) ever had directly stated it would stop purchasing Berg products due to this incident.

Berg submitted a sworn Proof of Loss to the Federal Insurance Company claiming that the actual cash value of the meat products at time of loss was $666,687.37. After levying a co-insurance penalty of $268,854.44 against Berg for errors committed in the Proof of Loss, the Federal Insurance Company paid Berg $397,732.93. Berg also obtained $13,404.27, representing its share of the proceeds derived from a salvage sale of the meat products. Berg has received a total of $436,137.20 for the meat products, a sum reflecting insurance proceeds, salvage resale proceeds, and proceeds received from a settlement with Lake Erie ($25,000).

---

1. The district court found as a matter of fact: "Although certain amounts of Kosher Zion and King Kold products were included in the meat products, and were transferred to ITC as part of the salvage, no restrictions were placed on their resale. Berg's President testified that this was an oversight."

Berg attempted to establish that its sales of sausage products decreased by approximately 325,000 pounds during fiscal year 1985, the same year the salvage resale transpired. But Berg offered no evidence of general industry trends during fiscal year 1985, and Berg's Vice President of Sales testified that he had no idea of Berg's market share in the industry at any specific juncture.

Berg had no evidence that either Gatto or New England participated in, had any knowledge of, or had any reason to know of any of Lake Erie's sales of the meat products within the United States, although (according to the terms of their sale) Gatto and Lake Erie shared profits on whatever meat products Lake Erie subsequently sold. Gatto and Lake Erie had a vendor/vendee or consignor/consignee relationship.

The district court held that under the Lanham Act, trademark infringement occurs when there is a likelihood of confusion, deception or mistake on the part of the consuming public. The court also found that trademark infringement can extend beyond those who actually mislabel goods or sell them to the consuming public with the mark of another. But the court also held that anticipation of a possible illegal use of the mark is not sufficient to establish contributory responsibility for any harm done by a deceitful trademark infringement.

The district court found as a matter of law that Berg's evidence supporting its partnership theory failed to elevate the consignor/consignee or vendor/vendee relationship of Gatto and Lake Erie to the level of a partnership. The district court found as a matter of law that Berg had failed to prove the existence of a Gatto/Lake Erie partnership, and had in turn failed to establish any basis upon which to hold Gatto or New England contributorily responsible for the alleged trademark infringement by Lake Erie. The district court likewise found as a matter of law that Berg had failed to meet its burden of proving any likelihood of confusion.

## II.

Under Fed.R.Civ.P. 52(a) this court may correct errors of law, including mixed findings of law and fact, and any finding of fact premised upon a rule of law. *Jennings v. Tinley Park Community Consolidated School Dist. No. 146*, 864 F.2d 1368, 1373 (7th Cir.1988). Although we review rulings on pure questions of law de novo, the application of law to fact we review under the clearly-erroneous standard. *Air Line Pilots Ass'n, Int'l v. UAL Corporation*, 874 F.2d 439, 448 (7th Cir.1989). *Cf. Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1427–29 (7th Cir.1985).

We will not set aside findings of fact under Rule 52(a) unless they are clearly erroneous. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). When there are two permissible views of the evidence, this fact-finder's choice never is clearly erroneous. The trial judge's experience affords him expertise because his major role lies in determining facts and judging the credibility of witnesses. *Id.* at 574, 105 S.Ct. at 1511.

## III.

Berg brings this action for trademark infringement and damages under the United States Trademark Act of 1946, the Lanham Act, 15 U.S.C. § 1051, *et seq.* The Lanham Act establishes the rights available to holders of registered trademarks. *J. Walker and Sons v. DeMert & Dougherty, Inc.*, 821 F.2d 399, 407 (7th Cir.1987). The question on appeal is whether there was a trademark infringement here justifying an award of damages.

Berg's claim of trademark infringement specifically depends upon 15 U.S.C. § 1114(1)(a). Section 1114 provides in pertinent part:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services

on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive;

. . . . .

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

Berg contends that to the extent Gatto is liable to Berg, New England likewise is liable in its capacity as Gatto's partner. Gatto and New England contend that their conduct did not constitute trademark infringement because it included no infringing sale.

The protection of trademarks is the law's recognition of the value of symbols. "A trademark is a merchandising shortcut which induces a purchaser to select what he wants, or what he has been led to believe he wants." *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge*, 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381 (1942). A "trademark" itself is not really that which is infringed. What truly is infringed is the public's right to be secure from confusion and the corresponding right of each trademark's owner to control its own product's reputation. *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir.1976).

Berg argues for trademark infringement liability on three grounds. First, Gatto's sale of the meat products to Lake Erie constituted trademark infringement in itself. Second, Gatto's sale of the Berg-labeled meat products to Lake Erie without extracting any agreement from Lake Erie that the labels be removed, or that the meat not be sold within the continental U.S., caused Gatto to be liable for contributory infringement. Third, Gatto and New England are liable as joint tortfeasors because they are members of what Berg calls a distribution chain.

*The sale to Lake Erie*

■ Berg argues that trademark infringement can exist even in sales other than to consumers. The congressional intent underlying § 1114(1) is to preclude the use of trademarks which are likely to cause confusion of any kind. Thus, every seller who causes such confusion by the use of trademarks becomes liable as an infringer. Berg contends that subsequent purchasers would be confused about the quality of the meat, and the original sellers such as Gatto are liable.

■ But the district court found as a matter of fact that prior to the Gatto–Lake Erie sale, Gatto advised Lake Erie of the restrictions in the Gatto–ITC purchase agreement relating to the sale of the meat products and the use of the Berg label. This finding is not clearly erroneous, so this factual determination forecloses Berg's argument that Lake Erie was "confused." Lake Erie knew exactly what it was getting. Not only was Lake Erie not confused about the product it purchased, but the district court further found that "Berg presented no credible evidence that any of Lake Erie's purchasers of the meat products were actually confused about the source or quality of what they bought."

Berg even stipulated that Gatto's President David Sallet told Lake Erie's President Ted Silverberg, when Gatto sold the meat products to Lake Erie, that they should be sold outside the United States. Sallet actually read to Silverberg the paragraph from the purchase agreement forbidding use of Berg's name regarding any future sales of the Gatto-purchased meats.

*Contributory infringement*

Although he knew of Berg's restrictions of Gatto, Silverberg never promised to sell the meats outside the United States.[2] Berg argues for liability for contributory infringement on the ground that a placing

**2.** Berg relies upon *J. Walker and Sons v. DeMert & Dougherty, Inc.*, 821 F.2d 399 (7th Cir.1987), for the proposition that causing an infringing product to enter commerce is itself a trademark infringement engendering liability. In *J. Walker and Sons* the defendant DeMert & Dougherty, Inc., had shipped cans of deodorant bearing *allegedly* infringing trademarks, so that this court held that the "in commerce" requirement of the Lanham Act had been satisfied. But we remanded because an issue of material fact remained as to whether that defendant actually had violated the Lanham Act. *Id.* at 408.

into commerce as here, with no restriction upon resale of the trademarked product, constitutes intentional inducement of infringement. Berg contends that failing actually to extract an agreement that the other party will not infringe upon the trademark not only fails to restrict trademark infringement, but intentionally induces it. Both sides rely upon *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378 (9th Cir. 1984).

▮ The determination of contributory infringement depends upon a defendant's intent and its knowledge of the wrongful activities of its distributors. *Id.* at 1382. A manufacturer can be held liable for contributory trademark infringement even if it does not itself mislabel the goods or deceive any customers. *Inwood Laboratories v. Ives Laboratories*, 456 U.S. 844, 853–54, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982). If a distributor "[i]ntentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement the . . . distributor is contributorily responsible. . . ." *Id.*

▮ But the district court found as a matter of fact that Berg had presented no evidence that either Gatto or New England had participated in, had any knowledge of, or had any reason to know of any of Lake Erie's own allegedly-infringing sales of these meat products within the U.S. Even if we assume that the law provides that a failure to prevent an infringement as alleged here is tantamount to inducing such an infringement, there was no infringement here. Without the requisite knowledge or intent, neither Gatto nor New England could be held liable. The court's finding is not clearly erroneous and there is no contributory infringement.

*Joint tortfeasor liability*

Berg finally argues that because there was a supposed common plan here to sell the meat products without any agreement to restrict the use of the trademark or the place of sale, there is joint tortfeasor liability for membership within the distribution chain. Both sides, again, rely upon the same case, *Smithkline Beckman Corp. v. Pennex Products Co.*, 103 F.R.D. 539 (E.D. Pa.1984).

▮ Because unfair competition and trademark infringement are tortious, the doctrine of joint tortfeasors does apply. *Id.* at 540. Every person actively partaking in, lending aid to, or ratifying and adopting such acts is liable equally with the party itself performing these acts. *Id.* But the district court here found as a matter of fact that there was no evidence that Gatto and Lake Erie had any type of partnership agreement, that they held themselves out to the public or operated as a partnership, that either had authority to bind the other in any transaction with any third party, or that they exercised joint ownership of, or control over, the meat products after they were sold to Lake Erie. The district court's findings of fact are not clearly erroneous, and those facts preclude any joint tortfeasor liability.

While Berg has argued tort liability throughout, Berg has apparently chosen not to pursue a breach of contract action against Gatto. Therefore, it is unnecessary to speculate whether such a contract suit might have succeeded in the circumstances existing here. On appeal to this court a litigant is restricted, of course, to those arguments which already have been raised at the trial court level. *Jones v. Hamelman*, 869 F.2d 1023, 1029 (7th Cir. 1989); *Winstead v. Indiana Insurance Co.*, 855 F.2d 430, 435 (7th Cir.1988).

### IV.

The trial court held that Berg had failed to demonstrate the existence of any ground on which the district court might hold either New England or Gatto contributorily responsible for a fourth party's (Lake Erie) trademark infringement. The trial court likewise found that Berg also had failed to meet its burden of demonstrating any likelihood of product confusion. These findings preclude any finding of product confu-

sion or contributory trademark infringement.

AFFIRMED.