2014 DNH 021

**COACH, INC., et al.**

v.

**Peter J. SAPATIS, et al.**

**Civil No. 12–CV–506–PB.**

United States District Court, D. New Hampshire.

Jan. 31, 2014.

Erica Mecler Caron, Adler Pollock & Sheehan, Boston, MA, Jeffrey K. Techentin, Kyle Zambarano, Adler Pollock &

Sheehan, Providence, RI, for Coach, Inc., et al.

Gary M. Burt, Thomas J. Pappas, Primmer Piper Eggleston & Cramer PC, Jeremy T. Walker, Nicholas F. Casolaro, McLane Graf Raulerson & Middleton PA, Manchester, NH, Lisa Snow Wade, Robert S. Carey, Orr & Reno PA, Concord, NH, for Peter J. Sapatis, et al.

## MEMORANDUM AND ORDER

PAUL BARBADORO, District Judge.

This case arises from the sale of counterfeit goods by third party vendors at a flea market in Londonderry, New Hampshire. Coach, Inc. and Coach Services, Inc., purveyors of designer handbags and other personal goods, have sued Peter J. Sapatis, Londonderry Marketplace, LLC, Alaina E. Paul, and TABA Enterprises, LLC, seeking injunctive relief and damages based on alleged violations of federal and state law relating to trademarks, copyrights, and unfair business practices. Sapatis and Londonderry Marketplace move for summary judgment. I grant the motion in full with respect to Londonderry Marketplace and grant it in part and deny it in part with respect to Sapatis.

## I. BACKGROUND

Most of the evidence presented by Sapatis and Londonderry Market concerns events surrounding Sapatis's sale of the Flea Market to Paul and TABA in February 2008. In contrast, nearly all the evidence presented by Coach[1] relates to events occurring after the sale.

### A. Evidence Presented by Sapatis and Londonderry Market

Peter Sapatis has owned a large field and adjacent residence at 5 Avery Road in Londonderry, New Hampshire since at least 1991, when he established the Londonderry Flea Market as a sole proprietorship at that location. Doc. No. 30–2. The Flea Market operates nearly every weekend from April through October. In 2003, Sapatis formed Londonderry Marketplace, LLC, through which he operated the Flea Market until 2008. Sapatis has always been Londonderry Marketplace's sole owner. *Id.*

On February 15, 2008, Sapatis's daughter, Alaina Paul, and Londonderry Marketplace executed an Asset Purchase Agreement and bill of sale that transferred ownership of the Flea Market from Londonderry Marketplace to Paul for $100,000. Doc. Nos. 30–3, 30–4. The Agreement specifies that Paul will pay $100,000 to Londonderry Marketplace over a ten-year period, with interest accruing on the outstanding balance. Doc. No. 30–3. Paul contemporaneously assigned her entire interest in the Flea Market to TABA Enterprises, LLC, a company owned solely by Paul. Doc. Nos. 30–2, 30–5.

The sale of the Flea Market did not include the land upon which it operates. Doc. Nos. 30–3, 30–4. Paul and Sapatis contemporaneously executed a five-year commercial lease of all the land at 5 Avery Road exclusive of Sapatis's home and the surrounding three acres. Doc. No. 30–6. The lease states that the property may only be used for the operation of an outdoor flea market. It specifies $36,000 in annual rent, made in two equal payments each year on the first of June and November. *Id.*

Sapatis continued operating the Flea Market's concession stand through the end of 2008, and then retired from the Flea

---

[1]  Coach, Inc. and Coach Services, Inc. have referred to themselves collectively as "Coach" throughout the pleadings. I follow their lead here.

Market. Doc. Nos. 30–2, 30–3. Londonderry Marketplace ceased doing business in 2009, ceased filing annual reports with the New Hampshire Secretary of State in 2011, and was administratively dissolved. Doc. No. 30–2. Sapatis has never been an employee of Paul or TABA or an employee or agent of any vendor at the Flea Market. Rather, TABA employs Linda Morrow to assist Paul with the Flea Market's operations. Since 2008, all vendors have contracted exclusively with TABA, Sapatis has not derived any direct income from the Flea Market or its vendors, and Sapatis has not conducted any advertising for the Flea Market. He continues to volunteer his time at the Flea Market because he wants his daughter's business to succeed, but he claims that he has had nothing whatsoever to do with the alleged sale of counterfeit goods at the Flea Market. *Id.*

### B. *Evidence Presented by Coach*

Since the sale of the Flea Market to Paul and TABA in 2008, Paul has paid Sapatis $12,000 each year toward the outstanding balance she owes him—currently $40,000—although she is unsure exactly how and when these payments have been made. Doc. Nos. 36–2, 36–4. Each of Paul's payments is completely offset by an annual gift of $12,000 that Sapatis makes to Paul. *Id.* None of these transactions have been recorded, and interest has never accrued on the outstanding balance. Doc. No. 36–4. The last time that Sapatis looked at the Asset Purchase Agreement was when it was executed in 2008. *Id.*

The $36,000 in annual rent specified in Paul's lease is paid to Sapatis out of the admission fees that customers pay to enter the Flea Market and the rent that vendors pay to operate their stands. Doc. No. 36–2. Sapatis, who keeps the Flea Market's books, pays himself rent out of these proceeds and records the payments on Paul's behalf. Doc. Nos. 36–2, 36–4. Paul has no involvement in the payments other than reviewing the records with Sapatis at the end of the year. Sapatis claims that he receives rent payments in the form of both cash and personal checks that he writes to himself in Paul's name, whereas Paul claims that the rent payments are made solely in cash. *Id.* Contrary to the lease terms, the payments are not made in two equal annual installments because "we've changed to whatever is okay at the time." Doc. No. 36–2.

Paul alleges that TABA has owned and managed the Flea Market since February 15, 2008 and that she receives mail for the Flea Market at 5 Avery Road. *Id.* Sapatis continues to reside at that address with his girlfriend Morrow, however, while Paul resides in Manchester. Doc. No. 36–4. The Flea Market's business office is located in Sapatis's home. Doc. Nos. 36–2, 36–4. It houses the Flea Market's telephone line as well as its vendor policy manuals for 2010 and 2011, which are each signed "Pete Sapatis."[2] *Id.; see* Doc. No. 36–5.

Sapatis claims that he has retired and that Morrow is primarily responsible for the Flea Market whenever Paul is otherwise occupied, but Paul claims that Sapatis has never retired and continues to assist her alongside Morrow in the operation of the Flea Market. Doc. Nos. 36–2, 36–4. Sapatis buys supplies for the Flea Market; maintains the grounds; provides business advice to Paul; answers calls on the Flea Market's main telephone line; keeps the books for the Flea Market (including forecasting future expenses and determining the Flea Market's liquidity needs); shows

**2.** Sapatis has not physically signed these policy manuals; rather, "Pete Sapatis" is typed at the bottom of what appears to be the final page of each manual, immediately below a space where the documents' creator would be expected to sign. *See* Doc. No. 36–5.

potential vendors available spaces for rent in the Flea Market; mediates arguments amongst vendors, customers, and the police, including arguments concerning the sale of counterfeit goods; and circulates through the Flea Market "all weekend" to keep aisles clear, inform vendors of Flea Market policies, maintain relationships with long-term vendors, and collect vendors' rent payments (including cash and checks made payable to either TABA or Sapatis himself). In short, Sapatis does "[a]lmost anything he thinks he needs to help [Paul] with," whether at Paul's direction or not. *Id.*

On June 26, 2011, two private investigators working for Coach, Andrea Powers and Michael Surette, arrived at the Flea Market and asked to speak to its owner. Doc. Nos. 35, 36–4. Sapatis was summoned and Powers and Surette informed him that counterfeit Coach products were being sold at the Flea Market. *Id.* Sapatis immediately called Morrow and a Londonderry police officer, who accompanied Powers and Surette while they inspected the Flea Market, purchased a number of counterfeit Coach products from vendors, and served these vendors with cease and desist orders. Doc. Nos. 36–1, 36–2, 36–4. Paul believes that she was working at the Flea Market's concession stand at the time "[b]ecause that's what I usually do." Doc. No. 36–2.

On August 2, 2011, Coach sent a letter to the "Owner/Manager[,] Londonderry Flea Market" alleging that counterfeit Coach products were being sold by Flea Market vendors and that those responsible for the Flea Market could be held liable if they failed to stop this unlawful activity. Doc. No. 36–1. Sapatis received this letter and attempted to contact Coach's counsel to seek assistance in complying with its instructions, although Sapatis is unsure whether he actually spoke with a representative of Coach at this time. Doc. No. 36–4. In September 2011, Sapatis called Surette "on behalf of the flea market" and offered to pay him to conduct another inspection. Doc. Nos. 35, 36–4. After conducting this inspection without payment on October 9, 2011, Surette informed Sapatis that the Flea Market was "clean, but not to say that you're going to stay th[at] way." *Id.* Sapatis responded that he "eventually would like to get out of the flea market business." Doc. No. 35. Surette assumed that Sapatis was still involved in the Flea Market's management and operation. *Id.* Powers subsequently sent a letter to "Peter Sepatis [sic][,] Owner[,] Londonderry Flea Market" on November 9, 2011 containing trademark images for a variety of brands to assist him in identifying counterfeit products at the Flea Market. Doc. No. 36–7. Sapatis then called Powers to obtain additional copies of the letter, which he planned to distribute to vendors. Doc. No. 36–4.

On April 29, 2012, Surette visited the Flea Market a third time and purchased counterfeit Coach products from five vendors. Doc. Nos. 36–2, 36–3. After this unannounced inspection, Surette spoke with Sapatis about the ongoing sale of counterfeit products at the Flea Market. Doc. No. 36–2. On May 14, 2012, Coach mailed another letter, similar in content to the August 2nd letter, to the "Owner/Manager[,] Londonderry Flea Market". Doc. No. 36–3. Paul received this letter and shared it with Sapatis and Morrow. Doc. Nos. 36–2, 36–4. Sapatis then called Coach's counsel seeking "help in taking care of this counterfeiting problem." Doc. Nos. 34, 36–4. Neither Paul nor anyone associated with TABA ever communicated with Coach or any of its representatives prior to Coach suing Paul and TABA in June 2013. Doc. No. 36–2.

During discovery, TABA produced numerous email messages sent from the Flea Market's main email address between February 27, 2011 and August 7, 2013. Doc. No. 36. Six hundred fifty-five of these messages identified Sapatis as the sender, whereas only forty-five messages originated from Paul. *Id.; see, e.g.,* Doc. Nos. 36–8, 36–9, 36–10, 36–11. In response to one message from a customer asking whether counterfeit products of a particular brand were for sale at the Flea Market, Sapatis responded on June 26, 2012 that they were not, but encouraged the customer to visit nonetheless because "[y]ou will most likely find something you want to have!" Doc. No. 36–9.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). An issue is considered genuine if the evidence allows a reasonable jury to resolve the point in favor of the nonmoving party, and a fact is considered material if it "is one 'that might affect the outcome of the suit under the governing law.'" *United States v. One Parcel of Real Prop. with Bldgs.,* 960 F.2d 200, 204 (1st Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In ruling on a motion for summary judgment, I examine the evidence in the light most favorable to the nonmoving party. *Navarro v. Pfizer Corp.,* 261 F.3d 90, 94 (1st Cir.2001).

The party moving for summary judgment bears the initial burden of identifying the portions of the record it believes demonstrate an absence of disputed material facts. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining what constitutes a material fact, "we safely can ignore 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Carroll v. Xerox Corp.,* 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990)).

## III. ANALYSIS

### A. Claims Against Sapatis

Coach brings eight claims against Sapatis: (1) contributory trademark counterfeiting[3] (15 U.S.C. § 1114); (2) contributory trademark infringement (15 U.S.C. § 1114); (3) contributory trade dress infringement (15 U.S.C. § 1125(a)); (4) contributory false designation of origin and false advertising (15 U.S.C. § 1125(a)); (5) contributory trademark dilution (15 U.S.C. § 1125(c)); (6) contributory copyright infringement (17 U.S.C. § 501); (7) state common law trademark infringement; and

---

**3.** The first two counts of Coach's amended complaint, "contributory trademark counterfeiting" and "contributory trademark infringement", arise under the same section of the Lanham Act, *see* 15 U.S.C. § 1114, and courts use the two terms interchangeably. *See Coach, Inc. v. Farmers Mkt. & Auction,* 881 F.Supp.2d 695, 700 (D.Md.2012); *Roger Cleveland Golf Co., Inc. v. Prince,* No. 2:09–2119–MBS, 2012 WL 1106775, at *1 (D.S.C. Mar. 30, 2012); *Feiya Cosmetics, LLC v. Beyond Beauty Int'l, LLC,* No. C–10–00967–JCS, 2011 WL 4506182, at *10 (N.D.Cal. Aug. 29, 2011), *rep. & rec. adopted,* No. C–10–0967– PJH, 2011 WL 4506165 (N.D.Cal. Sept. 29, 2011); *Marvisi v. Greenwich Ins. Co.,* No. 04–CV–6733 (TPG), 2006 WL 1422693, at *2 (S.D.N.Y. May 23, 2006). I therefore consider Counts I and II collectively under the more frequently used term "contributory trademark infringement." *See, e.g., Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 489, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (Blackmun, J., dissenting) (citing *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 860, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) (White, J., concurring in the result)).

(8) state common law unfair competition. I first analyze the claims arising under federal law before turning to the state law claims.

### 1. *Federal Law Claims (Counts I through VI)*

Sapatis moves for summary judgment on Counts I through VI based solely on his contention that ownership and lease of the land upon which the Flea Market operates, without any significant involvement in the Flea Market's operations or the conduct of its vendors, is insufficient to hold him contributorially liable under any legal theory. Coach counters that undisputed evidence of Sapatis's actual involvement with the Flea Market clearly establishes a genuine issue of material fact with respect to each cause of action.[4] I agree with Coach.

### a. Contributory Trademark Infringement (Counts I, II)

In *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* the Supreme Court interpreted section 32 of the Lanham Act, 15 U.S.C. § 1114, to prohibit contributory trademark infringement by those who facilitate, rather than engage directly in, trademark infringement as defined by the Act. 456 U.S. 844, 854, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). The Court held that a provider of a product who (1) "intentionally induces another to infringe a trademark" or (2) "continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement" is "contributorily responsible for any harm done as a result of the deceit." *Id.; see also Getty Petroleum Corp. v. Aris Getty, Inc.,* 55 F.3d 718, 719–20 (1st Cir.1995) (sole First Circuit decision referencing the *Inwood* standard). As the Ninth Circuit later explained, the contributory liability doctrine in trademark and copyright law is "an outgrowth of enterprise liability ... and imposes liability where one person knowingly contributes to the infringing conduct of another." *Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 264 (9th Cir.1996) (citing *Demetriades v. Kaufmann,* 690 F.Supp. 289, 292 (S.D.N.Y.1988); 3 Melville Nimmer & David Nimmer, *Nimmer on Copyright* § 1204[a][2], at 1275 (1995)); *see also Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.,* 955 F.2d 1143, 1148–49 (7th Cir.1992) (citing *David Berg & Co. v. Gatto Int'l Trading Co.,* 884 F.2d 306, 311 (7th Cir.1989); Restatement (Second) of Torts § 877(c) & cmt. d (1979)) ("[W]e have treated trademark infringement as a species of tort and have turned to the common law to guide our inquiry into the appropriate boundaries of liability."). Although the *Inwood* standard for contributory trademark infringement expressly references only products—unsurprising since that case concerned the sale of products used to infringe a third party's trademark—the doctrine has since been expanded to govern the activities of service providers as well, including those who operate flea markets where vendors sell counterfeit goods. *See, e.g., Coach, Inc. v. Goodfellow,* 717 F.3d 498, 500 (6th Cir. 2013); *Fonovisa,* 76 F.3d at 265; *Hard Rock,* 955 F.2d at 1148.

Coach has not alleged that Sapatis intentionally induced vendors to infringe its trademarks under *Inwood's* first prong. Rather, Coach claims that Sapatis violated *Inwood's* second prong by continuing to

---

**4.** For purposes of this motion for summary judgment, the parties dispute only Sapatis's degree of control over the Flea Market and its vendors, not the separate but related issues of his notice of the vendors' infringing conduct and the sufficiency of any steps taken to stop it. *Cf. Coach, Inc. v. Gata Corp.,* No. 10–CV–141–LM, 2011 WL 2358671, at *7–10 (D.N.H. June 9, 2011). I take no position concerning the latter issues at this time.

provide his services to particular vendors whom he knew or had reason to know were infringing Coach's trademarks. Doc. No. 26; *see Inwood,* 456 U.S. at 854, 102 S.Ct. 2182.

To date, no court of appeals has held a defendant who was not a flea market's owner contributorially liable for trademark or copyright infringement arising from a vendor's unlawful conduct at the site. *See Goodfellow,* 717 F.3d at 500; *Fonovisa,* 76 F.3d at 265; *Hard Rock,* 955 F.2d at 1148. Furthermore, the parties have directed me to no lower-level decision that has found liability under such circumstances. Sapatis's argument—that mere ownership of the land, without any concomitant ownership interest in the Flea Market, precludes contributory liability—is thus not unreasonable at first glance. *See* Doc. No. 30–1.

■ The cases make abundantly clear, however, that the relevant inquiry is not whether the defendant owned the venue where trademark infringement took place, but whether the defendant had sufficient control over the individuals directly engaging in such infringement. *See Lockheed Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980, 984 (9th Cir.1999) (citing *Fonovisa,* 76 F.3d at 265; *Hard Rock,* 955 F.2d at 1148–49) ("[W]e consider the extent of control exercised by the defendant over the third party's means of infringement.... Direct control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark" is sufficient to meet the *Inwood* standard). Sapatis initially attempts to escape this conclusion by relying on an unpublished decision in which a flea market landlord escaped contributory liability. *See* Doc. No. 30–1 (citing *Malletier v. The Flea Mkt., Inc.,* 2009 WL 1625946, at *3 (N.D.Cal. June 10, 2009) ("No case supports the proposition that a property owner may be liable for contributory

trademark infringement if it only leases property to a separate and distinct entity, which in turn operates a flea market and rents space to a vendor, which in turn infringes trademarks. Property ownership alone does not establish that Defendant exercised control over the sale of the infringing products.")). But as Coach makes exceedingly clear, Sapatis's activities went far beyond "only" owning the land and leasing it to a separate entity. *See* Doc. No. 33–1. Ultimately, Sapatis concedes that the defendant's degree of control over the infringer—rather than his or her nominative status as owner, lessor, or lessee—is the determinative factor. *See* Doc. No. 30–1 ("The key issue in determining whether to hold a service provider liable for contributory trademark infringement under the second *Inwood* standard is whether the defendant can exercise control over the direct infringer.").

The parties cite a handful of cases that serve as useful guideposts in determining the degree of control required for contributory liability to attach. In *Goodfellow,* the Sixth Circuit held that a flea market owner and operator who "provide[d] ... rental booths and storage units for vendors" was contributorially liable when he had reason to know of trademark infringement committed by some vendors. 717 F.3d at 503. Finding "little difficulty in holding that the allegations in this case are sufficient to show" control, the Ninth Circuit noted in *Fonovisa* that "it would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by the [flea market]. These services include, inter alia, the provision of space, utilities, parking, advertising, plumbing, and customers." 76 F.3d at 264. In a recent case in which Coach successfully sued a different New Hampshire flea market for con-

tributory trademark infringement, Judge McCafferty noted that "[t]he issue of proximity [between the defendant and the infringing vendors] ... is related to the issue of control, which is a key component of the analysis." *Coach, Inc. v. Gata Corp.*, No. 10–CV–141–LM, 2011 WL 2358671, at *7 (D.N.H. June 9, 2011). Accordingly, she found that "the operator of a flea market that rents spaces to vendors exercises substantial[ ] ... control over potential direct infringers...." *Id.* at *8.

In contrast, the Seventh Circuit in *Hard Rock* discussed a useful hypothetical in which a "temporary help service ... might not be liable if it furnished [a flea market vendor] the workers he employed to erect [the] stand" from which the vendor sold counterfeit goods. 955 F.2d at 1148–49. Such minimal control as that exercised by the temporary worker over an infringing vendor is analogous to the negligible control exercised by companies that provide services over the internet, such as credit card payment processing or registration of domain names, to third parties who publish infringing content on web sites utilizing those services. *See, e.g., Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 807 (9th Cir.2007) (payment processing); *Lockheed Martin*, 194 F.3d at 985 (domain name registration). The defendants' attenuated relationship with, and control over, the unlawful conduct in these cases absolved them of contributory liability.

Viewing the evidence in the light most favorable to Coach, I conclude that Sapatis exercised sufficient control over the Flea Market and its vendors during the time period in question for a reasonable jury to hold him contributorially liable for the vendors' conduct.[5] Coach's allegations strongly support the inference that Sapatis's contribution to the Flea Market's operations "increased the level of infringement by providing a centralized place ... where infringing works could be collected, sorted, found, and bought, sold, or exchanged." *See Visa*, 494 F.3d at 799; *see also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1174 (9th Cir.2007) (noting the significance in *Fonovisa* that the defendant "had the ability to identify and police infringing activity by patrolling its premises"). A jury could reasonably believe that Sapatis essentially *was* the Flea Market in the eyes of customers (who received the bulk of their email responses from Sapatis, had their phone calls answered by Sapatis, witnessed him patrolling the Flea Market "all weekend", and resolved their arguments with vendors); in the eyes of vendors (who were shown spaces to rent by Sapatis, were informed by Sapatis about Flea Market policies that had been developed by Sapatis, maintained longstanding relationships with Sapatis, and sometimes wrote their rent checks directly to Sapatis); and in the eyes of third parties such as Coach (who, until this lawsuit, consistently referred to Sapatis as the Flea Market's owner without ever being corrected by Sapatis or anyone else). Many vital aspects of the Flea Market's operations were also controlled by Sapatis, including bookkeeping, groundskeeping, provision of supplies, and financial decision-making. Although Sapatis claims to have received no direct income from the Flea Market or its vendors, this seriously misrepresents the fact that he personally drew rent payments directly from customer admission fees and vendor rent payments, on his own schedule and without Paul's involvement.

---

5. Even if I were to consider the evidence in the light most favorable to Sapatis, I would likely reach the same conclusion. That is because many of the undisputed facts forming the basis of Coach's claims are taken directly from Sapatis's own deposition testimony. *See* Doc. No. 36–4.

Even if Paul and TABA technically owned the Flea Market and contracted with its vendors, a reasonable jury could conclude on the basis of these facts that if anyone exercised the requisite control over the Flea Market's vendors (including those who infringed Coach's trademarks), it was Sapatis. Accordingly, I deny summary judgment to Sapatis on Counts I and II.

**b. Contributory Trade Dress Infringement; Contributory False Designation of Origin And False Advertising; and Contributory Trademark Dilution (Counts III–V)**

■ Although neither the Supreme Court nor the First Circuit have discussed contributory trade dress infringement, "several influential courts have recognized [it] as a cause of action." *See Coach, Inc. v. Farmers Mkt. & Auction*, 881 F.Supp.2d 695, 703 (D.Md.2012) (citing *Coach, Inc. v. We Care Trading Co., Inc.*, 67 Fed.Appx. 626, 630 (2d Cir.2002) (upholding jury verdict for contributory trade dress infringement); *Bauer Lamp Co., Inc. v. Shaffer*, 941 F.2d 1165, 1171 (11th Cir.1991) ("A person who knowingly participates in furthering ... trade dress infringement is liable as a contributing party."); *R.F.M.A.S., Inc. v. Mimi So*, 619 F.Supp.2d 39, 84 (S.D.N.Y.2009) ("[T]hose who knowingly play a significant role in furthering trade dress infringement are liable as contributing parties.")).

The same is true for contributory false designation of origin and false advertising. *See id.* at 704–05 (citing *Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*, 380 F.3d 126, 133 (2d Cir. 2004); *Fare Deals Ltd. v. World Choice Travel.Com, Inc.*, 180 F.Supp.2d 678, 686–87 (D.Md.2001); *Grant Airmass Corp. v. Gaymar Indus., Inc.*, 645 F.Supp. 1507, 1511–12 (S.D.N.Y.1986)) ("[T]o state a claim for contributory false designation of origin and false advertising, Coach must [show] ... that (1) despite knowing that the Vendor Defendants were using in commerce the plaintiff's mark in a manner likely to confuse consumers about the source or sponsorship of the goods or services, (2) the Market Defendants continued to supply a means of infringement (3) over which they had means of control or monitoring and which they have actively supported through various promotional efforts." (internal quotation marks omitted)); *see also ADT Sec. Servs., Inc. v. Sec. One Int'l, Inc.*, No. 11–CV–05149–YGR, 2012 WL 4068632, at *3 (N.D.Cal. Sept. 14, 2012) ("In light of other courts' reasoned extension of a claim for contributory false advertising ... under the Lanham Act, the Court similarly finds such an extension to be appropriate.").

Lastly, although the Supreme Court and First Circuit have not addressed a contributory trademark dilution claim, this court has recognized such a cause of action once before. *See Coach, Inc. v. Gata Corp.*, No. 10–CV–141–LM, 2011 WL 1582954, *5 (D.N.H. Apr. 26, 2011) (holding that a cause of action for contributory trademark dilution "does, in fact, exist," but declining to analyze it at the motion to dismiss stage). Another district court has explained that the claim requires a showing that the defendant "either encouraged others to dilute or, as in *Inwood Laboratories*, continued to supply their product [or service] to one whom it knows or has reason to know is engaging in trademark infringement...." *Farmers Mkt. & Auction*, 881 F.Supp.2d at 706 (internal quotation marks omitted); *see also Lockheed Martin*, 194 F.3d at 986 (citing *Kegan v. Apple Computer Inc.*, 42 U.S.P.Q.2d 1053, 1062 (N.D.Ill.1996)) ("The one court to recognize the contributory dilution cause of action defined the claim as encouraging others to dilute.... The proposed cause of action thus appears to import the defini-

tion of 'contributory' from *Inwood* ...."); *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F.Supp.2d 463, 526 (S.D.N.Y.2008) (assuming without deciding that a contributory trademark dilution cause of action exists and analyzing it under the *Inwood* framework), *aff'd in part, rev'd on other grounds in part*, 600 F.3d 93 (2d Cir.2010).

Because the parties proceed as if all three causes of action exist in this circuit, and that they each essentially incorporate *Inwood's* "supplies its [service] to one whom it knows or has reason to know is engaging in [unlawful conduct]" standard, I assume without deciding that the parties are correct in their beliefs. Sapatis moves for summary judgment with respect to each count on the sole ground that he exercised insufficient control over the Market and its vendors to satisfy the *Inwood* standard. Consequently, I deny his motion on Counts III, IV, and V for the reasons discussed above.

### c. Contributory Copyright Infringement (Count VI)

The First Circuit has never directly addressed contributory copyright infringement, and the two Supreme Court cases discussing the doctrine have primarily dealt with aspects not at issue in this case. *See Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, 125 S.Ct. 2764, 162 L.Ed.2d 781 .(2005) (citing *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir.1971)) (noting that "[o]ne infringes [a copyright] contributorily by intentionally inducing or encouraging direct infringement," but addressing only intentional inducement); *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 442, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (establishing a safe harbor precluding contributory copyright liability for the provision of products with "commercially significant noninfringing uses"). One analogous case concerning contributory copyright infringement in the context of a flea market has reached the courts of appeal, however. *See Fonovisa*, 76 F.3d at 261. The Ninth Circuit in *Fonovisa* applied a "material contribution to the infringing activity" standard to hold that the plaintiff had stated a claim against a flea market owner for contributory copyright infringement, relying on essentially the same facts as it did in the contributory trademark infringement context. *See id.* at 264; *cf. Sony*, 464 U.S. at 487, 104 S.Ct. 774 (Blackmun, J., dissenting) ("[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' [copyright] infringer." (quoting *Gershwin*, 443 F.2d at 1162)). While noting that "[t]he doctrine of contributory copyright infringement ... is not well-defined," Justice Blackmun concluded in *Sony* that liability "may be imposed even when the defendant has no formal control over the infringer." 464 U.S. at 487, 104 S.Ct. 774 (Blackmun, J., dissenting).

■ Regardless of the precise terminology employed, it is sufficient for the purposes of this case to note that "[contributory] trademark infringement liability is more narrowly circumscribed than [contributory] copyright infringement...." *See Fonovisa*, 76 F.3d at 265 (citing *Hard Rock*, 955 F.2d at 1149); *accord Visa*, 494 F.3d at 806; *Contessa Food Prods. Inc. v. Lockpur Fish Processing Co.*, 123 Fed. Appx. 747, 751 n. 3 (9th Cir.2005); *see also Sony*, 464 U.S. at 439 n. 19, 104 S.Ct. 774 (contrasting the broader standard for contributory copyright infringement with *Inwood's* "narrow standard for contributory trademark infringement"). If a reasonable . jury could find that Sapatis's actions satisfied the *Inwood* contributory trademark

infringement standard, it could similarly find that they satisfied the less stringent "material contribution" standard for contributory copyright infringement. Accordingly, I deny Sapatis summary judgment on Count VI for the reasons discussed above.

### 2. State Law Claims (Counts VII and VIII)

#### a. Common Law Contributory Trademark Infringement (Count VII)

Sapatis notes, correctly, that the New Hampshire Supreme Court has never recognized a cause of action for contributory trademark infringement.[6] If that court were to do so, according to Sapatis, it would likely analyze the claim under the federal *Inwood* standard. Sapatis contends that his activities at the Flea Market during the relevant time period fail to meet that standard, warranting summary judgment in his favor.

Although the case law is scant, the New Hampshire Supreme Court appears to rely primarily on federal law when state trademark claims arise. *See, e.g., Nordic Inn Condo. Owners' Ass'n v. Ventullo,* 151 N.H. 571, 576, 864 A.2d 1079 (2004) (adopting the federal law doctrine of estoppel by laches for state common law trademark claims). If it were presented with the issue, I see no reason why the New Hampshire Supreme Court would not recognize the common law tort of contributory trade-

mark infringement in line with the *Inwood* standard. Accordingly, I assume without deciding that a cause of action for contributory trademark infringement exists under state law and deny Sapatis's motion for summary judgment on Count VII for the reasons discussed above.

#### b. Common Law Unfair Competition (Count VIII)

■ "[T]he New Hampshire Supreme Court has not defined the exact contours of common-law unfair competition...." *Mueller Co. v. U.S. Pipe & Foundry Co.,* No. 03–170–JD, 2003 WL 22272135, at *5 (D.N.H. Oct. 2, 2003) (quoting *Optical Alignment Sys. & Inspection Servs., Inc. v. Alignment Servs. of N. Am., Inc.,* 909 F.Supp. 58, 61 (D.N.H.1995)). Coach directs me to a decision of this court which concludes that New Hampshire would recognize such a claim under the framework described in the Restatement. *See Pacamor Bearings, Inc. v. Minebea Co.,* 918 F.Supp. 491, 501 (D.N.H.1996) ("[O]ne who, in connection with the marketing of goods or services, makes a representation relating to the actor's own goods, services, or commercial activities that is likely to deceive or mislead prospective purchasers to the likely commercial detriment of another ... is subject to liability to the other ...." (quoting Restatement (Third) Unfair Competition § 2 (1995))). Accepting *Pacamor Bearings's* conclusion for the purposes of analysis, Coach must identify a

---

**6.** Sapatis also notes that a literal reading of Coach's amended complaint indicates that it states a claim for direct trademark infringement under New Hampshire common law without alleging contributory liability. *See* Doc. No. 26 ("Defendants ... have used and are continuing to use spurious designations that are identical to ... the Coach Trademarks .... in violation of the common law."). He contends that the claim fails due to lack of evidence demonstrating that he, rather than the vendors, directly infringed Coach's trade-

marks. Coach's objection to Sapatis's motion for summary judgment makes clear that it intended to assert a common law contributory trademark infringement claim. *See* Doc. No. 33–1. Because both sides have made their arguments regarding common law contributory liability, I decline Sapatis's invitation to conduct the meaningless exercise of granting him summary judgment on this Count, then granting Coach leave to amend its complaint to more clearly assert the appropriate claim.

genuine issue of material fact with respect to the following elements: "(a) [Sapatis's] representation is material, in that it is likely to affect the conduct of prospective purchasers; and (b) there is a reasonable basis for believing that the representation has caused or is likely to cause a diversion of trade from [Coach] or harm to [its] reputation or good will." *See id.* (quoting Restatement (Third) Unfair Competition § 3).

"Assuming without deciding ... that New Hampshire would recognize a viable unfair competition [claim] in a case where someone 'engages in conduct which deceives the general buying public,'" *see Wilcox Indus. Corp. v. Hansen*, 870 F.Supp.2d 296, 304–05 (D.N.H.2012) (quoting *Optical Alignment*, 909 F.Supp. at 61), Coach has failed to identify any material representation made by Sapatis that likely deceived or misled a potential customer. Coach points in general terms to Sapatis's "interface with vendors and customers on behalf of the Flea Market, his marketing of its commercial activities, and his supervision [of] the vendors who sold the Infringing Products...." Doc. No. 33–1. It is certainly likely that these activities gave customers (as well as vendors and representatives of Coach) the false impression that Sapatis continued to own the Flea Market beyond 2008. But at least for purposes of an unfair competition claim, his representations (if the aforementioned activities can be called that) were not material because no evidence indicates that they "affect[ed] the conduct of prospective purchasers" or were "likely to cause a diversion of trade from [Coach] or harm to [its] reputation or good will." *See Pacamor Bearings*, 918 F.Supp. at 501. In all likelihood, customers would have behaved exactly the same way, and Coach would have suffered exactly the same harm, even if customers had no doubt that Paul and TABA were the Flea Market's proprietors.

The only specific representation that Coach directs me to is Sapatis's June 26, 2012 email message to a potential customer "invit[ing] him or her] to visit the Flea Market in response to requests for 'fake' products for sale." Doc. No. 33–1 (citing Doc. No. 36–9). That customer inquired whether "you have any tables that sell fake ray bans ...," to which Sapatis replied, "There are hundreds of sellers who are here to sell many different items! You will most likely find something you want to have! As for the fake ray bans? ... I think there is [sic] none." Doc. No. 36–9. Regardless of whether this message contains some hidden meaning that misled the customer about the authenticity of certain sunglasses for sale at the Flea Market, one thing is clear—it says absolutely nothing about Coach's products, authentic or not.

It may be true, as Coach claims, that "[t]he sale of counterfeit products gives rise to the inference of consumer confusion," *see* Doc. No. 33–1, but that would only support an unfair competition claim against the infringing vendors. As for Sapatis, nothing in the record indicates that he ever made a representation that "[d]eceived consumers and the public into believing that Infringing Products are genuine or authorized by Coach." *See id.* I therefore grant summary judgment to Sapatis on Count VIII.

### B. *Claims Against Londonderry Marketplace*

■ Coach seeks to hold Londonderry Marketplace liable for all the same claims it asserts against Sapatis. Londonderry Marketplace argues that it had nothing to do with the Flea Market after November 2008, and it thus cannot be held liable for any allegedly unlawful activity occurring there in 2011 and 2012. In a sworn affidavit, Sapatis states:

During the 2008 flea market season, Londonderry Marketplace, LLC ran the food concession at the Flea Market, but TABA Enterprises ran the flea market portion of the business. After the end of the 2008 flea market season, and into 2009, Londonderry Marketplace, LLC wound down its operations. It ceased to do business altogether in 2009. I stopped filing annual reports with the Secretary of State for Londonderry Marketplace, LLC in 2011 as I had no intention of reviving the business, and the company has now been administratively dissolved.

Doc. No. 30–2. Coach counters that Sapatis "has continued to act in a manner consistent with his earlier actions on behalf of [Londonderry Marketplace] without differentiating between his individual actions and those taken on behalf of the company," and that Sapatis "draws no meaningful distinction between his individual activities and those undertaken as a representative of his company." Doc. No. 33–1. But Coach presents no evidence to support this claim.

There is no mention of Londonderry Marketplace in the record after 2008, save for Sapatis's brief discussion of its winding down and administrative dissolution. Coach points to no specific evidence showing that Sapatis purported to act on behalf of Londonderry Marketplace in his dealings with the Flea Market at any point after 2008. Indeed, Coach concedes that "Sapatis's unambiguous representations in his affidavit ... strongly suggest that [his] infringing activities, at least since some point in 2009, were entirely undertaken on his own, individual behalf and not as a representative of [Londonderry Marketplace]." Doc. No. 33–1 (citing Doc. No. 30–2). Because Coach has presented no evidence linking the company to the alleged unlawful activity occurring at the Flea Market, I grant summary judgment to Londonderry Marketplace on all counts.[7]

## IV. CONCLUSION

For the foregoing reasons I grant the motion for summary judgment as it relates to Londonderry Marketplace in full, grant the motion as it relates to Sapatis on Count VIII, and deny it as it relates to Sapatis on all other counts. (Doc. No. 30).

SO ORDERED.

---

**7.** Coach notes that Londonderry Marketplace is "apparently urging that the company's inactivity justifies, in whole or in part, the entry of summary judgment in its favor." Doc. No. 33–1. Coach counters that Londonderry Marketplace "has been placed in an administrative dissolution status, but has not yet been dissolved." *Id.* In light of my ruling, I need not determine Londonderry Marketplace's exact corporate status or consider how a New Hampshire corporation's administrative dissolution, *see* N.H.Rev.Stat. Ann. § 293–A:14.21, might affect its liability under the instant claims.